**Claude Bernard ALLEN, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 87-1247.

District of Columbia Court of Appeals.

Argued Jan. 25, 1990.
Decided August 16, 1990.

---

**226**

Samia Fam, Public Defender Service, appointed by this court, with whom James Klein, Public Defender Service, and Henderson Hill, Public Defender Service, were on brief, for appellant.

Steven W. Pelak, Asst. U.S. Atty., with whom Jay B. Stevens, U.S. Atty., and Helen M. Bollwerk, Asst. U.S. Atty., were on the brief, for appellee.

Before ROGERS, Chief Judge, and FERREN and SCHWELB, Associate Judges.

ROGERS, Chief Judge:

Appellant Claude Bernard Allen appeals from his convictions by a jury of man- slaughter while armed and carrying a pistol without a license, D.C.Code §§ 22–2405, –3202, –3204 (1989 Repl.), on the grounds first, that his Confrontation Clause rights were violated by the admission of inadmissible hearsay evidence offered to show the state of mind of the decedent and that a cautionary instruction was insufficient to cure the harm, and second, that the prosecutor made improper use of missing witness and missing evidence inferences during closing argument. We find neither inadmissible hearsay nor abuse of discretion by the trial judge in concluding that the jury could follow the limiting instruction. However, we conclude that the prosecutor's improper use of missing witness and missing evidence prejudiced Allen's defense, and accordingly, we reverse.[1]

## I.

The government's evidence showed that on Sunday, November 13, 1983, Samuel Manning helped Annie Johnson, a mutual friend of Allen and Manning, and several other friends prepare for Johnson's daughter's birthday party. Annie Johnson testified that during the day Manning asked how he could contact Allen. According to Johnson, Patrick Dixon gave Allen's telephone number to Manning while warning Manning that Allen was going to kill him. Manning called Allen anyway, and invited him to come to Johnson's apartment that afternoon. Allen called back and afterwards, according to Johnson, Manning appeared "edgy," pacing in and out of the apartment. Johnson also testified that during that summer, while Manning was out of town,[2] Allen had been looking for him in connection with his car and some tapes which Manning had taken, and that she had heard Allen say to her husband on one occasion that he (Allen) was going to kill Manning.

---

[1.] In view of our disposition we do not reach Allen's other contentions that his convictions should be reversed because of curtailment of his testimony in violation of his constitutional right to present a defense, and admission of prior consistent statements.

[2.] Allen had warned Manning, that he (Allen) "would get him," and Manning left town thereafter.

Allen, accompanied by an unidentified man, arrived at the Johnson home within an hour of the second telephone call. According to Manning's girlfriend, Felicia Baldwin, Allen and Manning greeted each other as friends, and Allen told Manning not to worry about the car. Annie Johnson and two other men testified that Allen asked Manning to come outside with him "to talk ... about something," and the two men left the apartment together."[3]

After the two men went outside, a gunshot was heard. Annie Johnson saw Allen push Manning but did not see anything in Allen's hands. However, when she heard a second shot she saw fire coming from Allen's hand and Manning staggering. Felicia Baldwin saw Allen fire the second shot at Manning and watched Manning stagger into the apartment building, where he collapsed on the second floor.[4] Allen followed Manning to the front steps of the apartment building, and prepared to shoot again, but then turned and ran. Allen and the unidentified man got into the van and drove away.[5]

Allen was arrested almost two years later, in October 1985 in Miami, Florida by the Federal Bureau of Investigation. He claimed at the time that his name was Anthony Jenkins, and denied knowing anything about Manning's killing or the search for him. On the way back to Washington, D.C., however, he told a detective that Manning had been shot when he approached Allen's van, pulled a gun on Allen, and shot at him. Allen claimed he shot back with a .38 calibre gun and that a companion, Gerard, also shot at Manning.[6] An inmate at the Lorton Reformatory, Vincent Cunningham, testified that five or six months before the trial, Allen threatened Cunningham's brother and his brother's girlfriend, Felicia Baldwin, if she testified against Allen.

Appellant called three witnesses in support of his claim of self-defense. James Baldwin, Felicia's father, testified that after hearing a shot, he saw Allen and another man moving at a fast pace toward a van. Baldwin then saw Dixon fumble around Manning's waist for about five seconds and remove an object with a handle that looked like a pistol. Orlando Edwards, Annie Johnson's brother, testified that he saw Manning wrap a hanger around a gun, hook it onto himself and cover it with a sweater. Edwards heard two shots later that evening, and saw a gun in Manning's hand after Manning was shot. Raymond Johnson, Annie's estranged husband, testified that in the summer of 1983 Allen had told him that Manning had sold his car and that he was going to "kick [Manning's] butt." He denied, disputing Annie Johnson's testimony, that he had ever heard Allen threaten to kill Manning.

Allen testified that Manning had borrowed his car without permission and sold it in order to pay a drug debt. On November 13, 1983, Manning had called him to tell him he had the money to pay for the car, and invited him to the Johnson apartment. In the apartment, Allen spoke briefly with Manning, who went into a back bedroom, and afterwards the two men left the apartment, at Manning's suggestion according to appellant.

Once outside, Allen claimed that Manning accused him of having told Manning's mother that he used cocaine. Manning had

---

**3.** Earlier that day while in a back bedroom at the Johnson apartment, Manning had smoked marijuana with Patrick Dixon and another man. Dixon took out a gun and Manning demonstrated how a coat hanger could be used as a gun holster. After the demonstration, according to Freddie Prim, Manning placed the gun on a table in the bedroom, but kept the hanger attached to his pants.

**4.** Manning fell into George Davis's apartment door; Davis did not see a gun in Manning's hands. Annie Johnson also did not see a gun

anywhere, but she saw a coathanger attached to Manning's pants as he lay in Davis' doorway.

**5.** The police found an expended .38 caliber shell or casing in front of Johnson's building. A .38 caliber slug was removed from Manning's body, and gunshot residue was found on Manning's sweater.

**6.** On cross examination, Allen changed his story, denying that Gerard had shot at Manning.

become angry and threatened appellant. When Manning offered appellant the money he owed him for his car, appellant told Manning "he could take [his money] and stick it," and walked away. Manning then pulled out a gun and told appellant that he was "not going anywhere." As Allen ran, Manning fired at him. Allen found a gun in the van and warned Manning that he had a gun. When Manning continued to approach, Allen shot him. After the shooting, his companion, Gerard, kept the gun and dropped Allen off at his apartment. Shortly thereafter, after Dixon and some other men had come to his mother's house looking for him, Allen went to Florida in order to avoid being attacked by Manning's friends. Allen denied threatening Felicia Baldwin.

Allen was indicted for murder in the first degree while armed and carrying a pistol without a license, D.C.Code §§ 22–2401, –3201, –3204. The jury returned a verdict finding him not guilty of first-degree murder while armed but guilty of manslaughter while armed and carrying a pistol without a license.

## II.

■ Allen contends that the trial judge erred in admitting the rank hearsay testimony of Annie Johnson about the statement she heard Dixon make to Manning, that Allen was going to kill him. He maintains that the admission of the statement violated his confrontation rights under the Sixth Amendment and should have been excluded because its prejudicial effect outweighed its probative value. Alternatively, he maintains that the jury could not follow the trial judge's cautionary instruction on the limited, nonhearsay use of Dixon's statement.

In his main brief, Allen misconstrued the nature of Annie Johnson's testimony. She did not testify, as Allen contends, that Dixon had heard Allen threaten to kill Manning, but only that she heard Dixon tell Manning that appellant was coming to kill him.[7] The trial judge initially struck the testimony as inadmissible hearsay and highly prejudicial, but following a bench conference he admitted it as potentially probative of Manning's state-of-mind in view of Allen's self-defense claim in his opening argument to the jury.[8] After denying the defense objection to the efficacy of a curative instruction and request for a mistrial, the judge instructed the jury that he had erred in telling the jurors to strike it from their minds since the evidence was admissible "for a very limited purpose." That purpose, the judge immediately instructed, was to show that the statement was said on November 13 in order to explain what Manning may have said or done based on what he was told. The judge instructed the jury that the statement was not admitted to prove what Allen may or may not have intended.[9]

7. Annie Johnson's testimony about Dixon' statement was:

> [The prosecutor]: Okay. Do you know how [Manning] got [Allen's] phone number?
> [Annie Johnson]: From [Dixon].
> [The Prosecutor]: All right. And in response to [defense counsel's] question about [Dixon] giving the phone number, didn't you say [Dixon] told [Manning] what [Allen's] phone number was?
> [Annie Johnson]: Right.
> [The prosecutor]: Did [Dixon] say anything else to [Manning] when he gave [Manning] [Allen's] phone number?
> [Annie Johnson]: Yeah.
> [The prosecutor]: What else did he say?
> [Annie Johnson]. He said, man, [Allen] come to kill you.

8. The government argued that the testimony was necessary to explain Manning's potential possession of a gun, given appellant's claim that

Manning was the aggressor and had fired the first shot at appellant.

9. The full instruction to the jury was:

> THE COURT: Ladies and gentlemen, during the testimony of the witness, Miss Johnson, just before the lawyers came up to the bench for that rather long bench conference, you heard me tell you to strike a portion, a small portion of the witness's testimony in response to a question that was asked. I should not have actually stricken that testimony.
> The testimony was admissible but it was admissible only for a very limited purpose, and that is what I want to explain to you now.
> The testimony of the witness about what she overheard [Dixon] . . . say to Mr. Manning when he gave Mr. Manning the phone number, if you find that to be credible testimony and that she did hear that, and that's up to

Since the statement was introduced only to show that it was made, not that it was true, it was not hearsay and Allen's objection on that ground fails. The statement was offered neither as evidence that Allen had threatened Manning nor as evidence of Dixon's belief that Allen was coming to kill Manning. *See Jenkins v. United States,* 415 A.2d 545, 547 (D.C.1980) (defining hearsay evidence) (quoting McCORMICK, EVIDENCE, § 246 at 585 (2d ed. 1972). To that extent confrontation problems did not arise. *Tennessee v. Street,* 471 U.S. 409, 414, 415, 105 S.Ct. 2078, 2082, 85 L.Ed.2d 425 (1985) (prosecutor's nonhearsay use of prejudicial evidence admissible to rebut defense theory);[10] *United States v. Peaden,* 727 F.2d 1493, 1500 n. 11 (11th Cir.), *cert. denied,* 469 U.S. 857, 105 S.Ct. 185, 83 L.Ed.2d 118 (1984) (value of statement offered for nonhearsay purpose is that it was said and a defendant only needs to cross-examine the person who heard it). *See also Dutton v. Evans,* 400 U.S. 74, 88, 91 S.Ct. 210, 219, 27 L.Ed.2d 213 (1970) (no conflict with confrontation clause when witness testified "not only as to what he had seen, but also as to what he heard").[11]

Furthermore, for appellant to suggest that the evidence of the statement was of limited probative value ignores the reality of his defense at trial. *Clark v. United States,* 412 A.2d 21, 25 (D.C.1980) (victim's state of mind of particular interest to jury in first degree murder case where defendant claims accident, suicide or self-defense). Beginning with his attorney's opening statement to the jury, Allen claimed that Manning planned to kill him and lured him to Johnson's apartment, where Manning was waiting with a handgun in a holster made from a wire hanger. The government did not dispute that Manning may have had a gun in his possession when appellant shot him. Consequently, the government had the burden to disprove that Allen acted in self-defense and why Manning may have carried a gun. Although Dixon's statement was neither direct nor indirect evidence of Manning's state of mind, it was relevant to the extent that it affected Manning's fear and his reason for carrying a gun that day.[12] If Annie Johnson's testimony was believed, it offered an explanation of why Manning had acted as he did later that day. That the statement does not definitively answer whether Manning carried a gun for protection or for purposes of a preemptive strike misses the point. *See Reavis v. United States,* 395 A.2d 75, 78 (D.C.1978) (probative evidence) (citing *Punch v. United States,* 377 A.2d 1353, 1358 (D.C.1977)).

■ Allen's contention that the instruction was ineffective to mitigate the prejudice is based in part on a mischaracterization of the record. The judge did not ask the jury to consider a statement by appellant that he was coming to kill Manning, but rather to receive Dixon's statement for

---

you, was not admitted to prove in any way the truth of what [Dixon] ... may have said or not, and was not admitted to prove what Mr. Allen may or may not have intended.

It was admitted, however, if you find it to have been said, simply to show that was said to Mr. Manning on that day. And therefore, you may consider it to explain what Mr. Manning may have said or done based on what was told to him to the extent that you find Mr. Manning's state of mind on November 13th, 1983 to be relevant to any of the issues that you're going to be asked to decide in this case including, if it is presented to you, any defense of self-defense that may be presented.

10.  *See also Sargent v. Armontrout,* 841 F.2d 220, 226 (8th Cir.1988); *Collins v. Francis,* 728 F.2d 1322, 1336 (11th Cir.), *cert. denied,* 469 U.S. 963, 105 S.Ct. 361, 83 L.Ed.2d 297 (1984). Allen's

contention that the government's reliance on *Tennessee v. Street, supra,* 471 U.S. 409, 105 S.Ct. 2078, is misplaced is unpersuasive. Although in *Street* the prosecution was permitted to introduce the codefendant's confession was a carbon copy, the basic use of the nonhearsay is comparable to that in the instant case.

11.  The defense could have satisfied its confrontation concerns by calling Dixon. That there were reasons why it might not want to do so does not mean that the government's failure to call Dixon involved the kind of shielding that the Confrontation Clause seeks to prevent. *See Tennessee v. Street, supra,* 727 F.2d at 1500 n. 11.

12.  The state of mind exception to the hearsay rule is inapplicable since Dixon's state of mind

a very limited purpose of its possible affect on Manning. While Johnson's testimony about Dixon's statement was obviously prejudicial to appellant, the prejudice was mitigated in a variety of ways: first, by the fact that Dixon's statement had a potential inference in appellant's favor, namely, that Manning armed himself and attacked first; second, by the impeachment of Annie Johnson's credibility;[13] third, by the evidence of other threats by appellant to kill Manning; fourth, by the absence of any mention of Dixon's statement in the prosecutor's closing argument to the jury; and fifth, by the fact that limiting the instruction avoided any mention of the substance of Dixon's statement. Furthermore, the trial judge clearly and carefully explained the limited use of the testimony to the jury and the proper use of the statement was not complex. Accordingly, the trial judge could reasonably conclude that the jury would be able to follow his limiting instruction. *See Tennessee v. Street, supra,* 471 U.S. at 414–15, 417, 105 S.Ct. at 2081–82, 2083 (where confession by accomplice carried greater potential for unfair prejudice to defendant, court concluded instructions were adequate to protect against misuse of co-defendant's confession for its truth).[14]

In addition, the record suggests that the jury followed the instruction since it found appellant not guilty of first degree murder while armed, and convicted him of manslaughter. Thus, contrary to appellant's suggestion, the jury clearly did not consider the statement as "tantamount to a virtual confession of premeditation in ... first degree murder."[15] *Sherrod v. United States,* 478 A.2d 644, 659 (D.C.1984) (jury is presumed, unless there is evidence to the contrary, to follow the instructions of the court) (citing *Smith v. United States,* 315 A.2d 163, 167 (D.C.), *cert. denied,* 419 U.S. 896, 95 S.Ct. 174, 42 L.Ed.2d 139 (1974)). Accordingly, we find no abuse of discretion by the trial judge in admitting Johnson's testimony about Dixon's statement. *See Bennett v. United States,* 375 A.2d 499, 503–04 (D.C.1977) (no error where potentially prejudicial nonhearsay testimony admitted without limiting instruction); *Peaden, supra,* 727 F.2d at 1500–02 (same).

### III.

More troubling is Allen's contention that his cross-examination by the prosecutor and the prosecutor's closing arguments improperly invited the jury to make missing witness and missing evidence inferences, and thereby, shifted the burden of proof. The law on missing witnesses and missing evidence is well settled.[16] Before the jury may be asked to draw the inference that a missing witness' testimony

is irrelevant to the issues in the case. *United States v. Brown,* 160 U.S.App.D.C. 190, 194, 490 F.2d 758, 762 (1973).

**13.** In addition to the defense evidence disputing Annie Johnson's testimony that she had heard Allen tell her husband that he was going to kill Manning, Annie Johnson admitted that she had never told Manning about the conversation, and in closing argument defense counsel attacked her credibility regarding whether Manning had a gun and her testimony about hearing Dixon's statement.

**14.** Consequently, Allen's reliance on factually distinguishable cases, in which the hearsay statement of a co-defendant is used at trial, *see Lee v. Illinois,* 476 U.S. 530, 539, 106 S.Ct. 2056, 2061, 90 L.Ed.2d 514 (1986); *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968); *Foster v. United States,* 548 A.2d 1370 (D.C.1988), is misplaced.

**15.** Allen's relies on *United States v. Brown,* 160 U.S.App.D.C. 190, 207–09, 490 F.2d 758, 775–77

(1974) (factors for determining likelihood jury will misuse statement include its proximity to vital issue in case, corroboration, and extent it was inflammatory), and *Shepard v. United States,* 290 U.S. 96, 104, 106, 54 S.Ct. 22, 26, 78 L.Ed. 196 (court rejected state-of-mind theory of admissibility of statement by wife that her husband-defendant had killed her as too prejudicial because it contained assertions of fact about the ultimate issue). In the instant case, Dixon's statement was relevant to the issue of self-defense, and did not contain the direct assertion of which Allen mistakenly complains in his main brief or matters "so explosive as could not be contained by the limiting instruction." *Brown, supra,* 160 U.S.App.D.C. at 207, 490 F.2d at 775. Unlike the statement in *Shepard,* inferences can be drawn from this statement which support either Allen's defense or the government's theory.

**16.** *See, e.g., Graves v. United States,* 150 U.S. 118, 121, 14 S.Ct. 40, 41, 37 L.Ed. 1021 (1893);

would have been unfavorable, the trial judge must determine that the witness is able to elucidate the transaction and is peculiarly available to the party against whom the inference is made. *Arnold, supra* note 16, 511 A.2d at 415. The rule is designed to prevent the abuse of the missing witness inference and the use of half-truths, and "the validity of the missing witness inference cannot be tested solely on the basis of evidence before the jury," since "the jury is unlikely to have before it the necessary information with which to make a determination" of the witness' availability and ability to elucidate. *Givens v. United States*, 385 A.2d 24, 27 (D.C. 1978). In *Givens, supra*, the court found nonharmless error where the defendant, who asserted a claim of self defense, was never given an opportunity to prove to the trial court that the evidence before the jury relating to [a witness'] absence was incomplete and misleading," and the evidence that the defendant did the killing was abundant but the proof that defendant did not act in self defense was entirely circumstantial and hardly overwhelming. *Id.* at 28. *See Thomas, supra*, 447 A.2d at 60 (reversing conviction where relative credibility of paramount importance); *Haynes v. United States*, 318 A.2d 901, 903 (D.C.1974) (reversing conviction where the defendant's credibility was "all important to his defense").

■ Here, the prosecutor, over defense objection, cross examined Allen about whether he ever looked for Gerard after the shooting, whether he asked his sister to keep the van from which he claimed he had shot Manning, whether he attempted to preserve a shell casing that may have popped out after he fired the bullet that killed Manning, whether he had asked Gerard to preserve the gun that he had used to shoot Manning, and whether he and Gerard had looked, on the night of the shooting, in the van to see if there was anything that could help prove that he acted in self-defense. When the prosecutor asked Allen "That night, did you and Gerard look inside the van to see if there was anything in the van that could *help prove* that—," defense counsel objected. Nevertheless, the prosecutor continued asking the question before the judge could rule: *"—you acted in self-defense?"* The judge stated "He doesn't have to prove it," When defense counsel asked to come to the bench, the judge refused to let counsel do so, stating that he had overruled the objection.

The judge also denied Allen's request for a mistrial. Although conceding that the question was "probably, notably, unartfully phrased," the judge observed that the answer was interrupted when the objection was made. The judge also stated that in his final jury instruction he would make clear that Allen had no such burden, and referred to the fact that the prosecutor had rephrased the question in proper form. Although the prosecutor's question was interrupted by the defense objection, the prosecutor still completed his question so the jury knew what he was after. The jury also heard the judge overrule the objection.[17]

In rebuttal closing argument the prosecutor told the jury, again over defense objections, that if Allen had truly acted in self-defense he would have "scoured that van to get that shell casing and to preserve the gun" and would have "tried to keep Gerard ..., or know his last name." Further, he argued that Allen's self-defense claim should be disbelieved because "he did nothing, nothing to preserve what would support him." The same arguments were made by the prosecutor in his initial closing argument to the jury.

The government's position on appeal, that the prosecutor did not focus on Allen's

---

*Chappell v. United States*, 519 A.2d 1257, 1259 (D.C.1987); *Lawson v. United States*, 514 A.2d 787, 790 (1986); *Arnold v. United States*, 511 A.2d 399 (D.C.1986); *Thomas v. United States*, 447 A.2d 52, 58 (D.C.1982); *Shelton v. United States*, 388 A.2d 859, 863 (D.C.1978).

17. Defense counsel protested that the judge had not instructed the jury but simply "said that comment in a low tone of voice as if you were just talking to [the prosecutor]. There's no evidence that the jury heard it at all." The judge disagreed with the characterization of his tone of voice, stating "I barked it out," and declined

failure to produce evidence at trial but only on his failure to preserve evidence after the shooting, and thereby produced no missing evidence or missing witness inferences, undermines the missing evidence and missing witness rule and misreads the record. The improper inference from the cross-examination and closing arguments was no less than that Allen's failure to preserve evidence to introduce at trial was probative of his guilt. The prosecutor could properly ask Allen about his actions after shooting Manning and properly argue that Allen's flight and concealment were inconsistent with his trial testimony. *See Christian v. United States,* 394 A.2d 1, 32–33 (D.C. 1978), *cert. denied,* 442 U.S. 1944, 99 S.Ct. 2889, 61 L.Ed.2d 315 (1979) (no error where post crime flight and concealment argued to jury); *Gale v. United States,* 391 A.2d 230, 235 (D.C.1978), *cert. denied,* 439 U.S. 1133, 99 S.Ct. 1057, 59 L.Ed.2d 96 (1979) (post crime conduct including flight, concealment and intimidation of a witness admissible); *State v. Brown,* 128 N.H. 606, 517 A.2d 831, 834 (1986) (claim of accidental shooting, post crime conduct). The prosecutor could not, however, ask questions that impinged upon Allen's constitutional right to present a defense. Although the prosecutor acknowledged this during a bench conference, his strategy, as described to the trial judge, was implemented in a manner that impermissibly created evidence from the absence of evidence.[18] *See Arnold, supra* note 16, 511 A.2d at 415 (quoting *Burgess, supra note* 16, 142 U.S. App.D.C. 198, 206, 440 F.2d 226, 234 (1970)).

Following a defense objection, the prosecutor had proffered at a bench conference that it was not his intention to cross examine Allen about his efforts to contact Gerard in order to suggest that Gerard's testimony would be adverse to Allen; rather an attempt was being made to show that Allen's actions were inconsistent with his testimony. The judge overruled the defense objection, and declined to make explicit determinations about Gerard's availability, ruling that the prosecutor should not be precluded from asking questions about what Allen did after the shooting even if Allen could demonstrate Gerard's unavailability.[19] The judge also declined to hear a defense proffer of evidence that diligent efforts had been made to contact Gerard, stating that the defense would have an opportunity to present that evidence to the jury at a later time.

The risk inherent from the creation of evidence out of nonevidence requires that the preconditions to its admission be addressed by the judge before the potentially improper inferences are suggested to the jury. *Thomas, supra,* 447 A.2d at 58. In this manner the moving party is required to substantiate the factual basis for the inference and the opposing party is afforded a timely opportunity to oppose introduction. *Id.* (citing *Simmons v. United States,* 444 A.2d 962, 964 (D.C.1982)). The trial judge permitted the prosecutor to continue his line of questioning, despite a defense request for a prior ruling, see note 19, *supra,* because he was persuaded by the prosecutor's proffer that his cross-examination would address Allen's credibility, focusing on whether Allen's conduct was consistent with his claim of self-defense.

the defense request for an instruction to be given to the jury at this time. The judge also overruled defense counsel's two objections to the question "Did you tell Gerard on the night of November 13th, that you wanted him to stay close so that he could say what really happened in the van?"

18. The judge ruled that the prosecutor could attempt to discredit a self-defense claim by asking appellant if he had tried to find the other person. The prosecutor conceded, however, that "it does get very close to the line about missing witness, that his circumstances were such that he should have, he should have gotten

a hold of Gerard, he should have found him, and he should have looked for that shell casing, it must have remained in there, so that he could establish his self-defense." The prosecutor saw no problem in asking why Allen had not turned himself in. The judge disagreed, but still viewed the general line of questioning, about what Allen did after the shooting, to address Allen's efforts rather than Gerard's absence and was of the view that his instructions would make clear that Allen had no burden of proof.

19. Defense counsel called the trial judge's attention to *Chappell, supra,* 519 A.2d at 1259 (improper to cross examine in order to suggest

But by tying questions and assertions about Gerard, the gun, and the shell casing to Allen's inability to prove that he acted in self-defense, the prosecutor invoked the type of nonevidence and impermissible argument that the missing evidence and missing witness rule is designed to preclude, particularly where serious efforts have been made to locate a witness or where the nonevidence shifts the burden of proof.

While there is room for the prosecutor to respond to the defense claim of self-defense—here to show Allen's flight out of fear that he would not be believed, and concealment as indicating his consciousness of guilt, *Christian, supra,* 394 A.2d at 32–33, and to attack Allen's credibility because he said and did things differently than he testified at trial,[20] *see Streater v. United States,* 478 A.2d 1055, 1058–59 (D.C.1984) (prosecutor may argue all reasonable inferences from evidence, including flight and concealment)—the prosecutor may not, in the guise of meeting its burden of proof to show no self-defense, ignore the strictures of the missing evidence and missing witness rule. What the prosecutor did here, although not as egregious as the closing argument in *Givens, supra,* 385 A.2d at 26 (during closing argument the prosecutor asked why the eyewitness, a friend whom the defendant saw everyday, did not testify), accomplished the same thing and, thereby, crossed the line. The prejudice to Allen was clear once the judge overruled defense objections to the prosecutor's question about finding Gerard in order to prove self-defense and the prosecutor's closing argument linking Allen's inaction to proof of his self-defense claim.[21] Although the prosecutor had the burden to rebut Allen's self-defense claim, at these points it was

---

absent witness' testimony would be adverse in absence of prior ruling by trial court), which, in turn, referred to *Lawson v. United States,* 514 A.2d 787 (D.C.1986), *Arnold, supra* note 16, 511 A.2d at 415 and similar cases, and requested a ruling by the trial judge that the cross examination was improper. The judge stated that the prosecutor was prepared to assume, for purposes of the bench conference discussion, that Allen could demonstrate Gerard's unavailability to testify but should not be precluded from asking what Allen did after the shooting. The judge overruled the defense objection that the prejudice arising from the questioning outweighed the probative value of the evidence.

**20.** Based on the instructions to the jury, it appears that this is what the trial judge had in mind when he ruled that the government could cross examine Allen about his actions after the shooting.

**21.** The prosecutor asked the following series of questions during his cross-examination of Allen:

[Prosecutor]: Between November 13th and the time that you left for Florida did you see Gerard again?

&ast; &ast; &ast; &ast; &ast; &ast;

[Q]: You didn't look for him, did you?

&ast; &ast; &ast; &ast; &ast; &ast;

[Q]: Between the night of the shooting and January of 1984, did you ask your sister or your brother-in-law to hold onto the van?

&ast; &ast; &ast; &ast; &ast; &ast;

[Q]: You never asked them, did you to take a look in the van and see if they could find a shell casing?

&ast; &ast; &ast; &ast; &ast; &ast;

[Q]: That night, did you and Gerard look inside the van to see if there was anything in the van that could *help prove that* ... [defense objection] ... *you acted in self defense?*

&ast; &ast; &ast; &ast; &ast; &ast;

[Q]: Did you ask Gerard to hold onto the gun?

&ast; &ast; &ast; &ast; &ast; &ast;

[Q]: Did Gerard ask you, what do you want me to do with the gun?

&ast; &ast; &ast; &ast; &ast; &ast;

[Q]: Between ... November 13, 1983, and the time that you left for Florida, did you ask your sister or brother-in-law about Gerard?

&ast; &ast; &ast; &ast; &ast; &ast;

[Q]: Did you tell Gerard on the night of November 13th, that you wanted him *to stay close so that he could say* what really happened in the van?

&ast; &ast; &ast; &ast; &ast; &ast;

[Q]: I'm just asking you, did you ask Gerard, that night, after you shot [Manning], did you ask him *to stay in touch* with me because you know what happened? [Emphasis added]

In his closing argument, the prosecutor continued to infer that Allen had failed to produce both evidence and a witness.

But [Allen] went over there with a stranger, someone nobody else knew, somebody whose last name nobody knows. He went over there with the stranger. He shot [Manning]. He walked away from him. Not only walked away from it, he fled from it. *He didn't look in the van for the cartridge case to see if it might still be there. He didn't try to keep the gun. He didn't try to keep hold of Gerald or Gerard.* [Emphasis added]

clear the prosecutor was going beyond simply questions and argument about Allen's post-shooting conduct. When the prosecutor asked Allen if he had told Gerard to stay close "so he could say what really happened," the clear inference, much as it was in *Givens, supra,* was so that Gerard could say in court what really happened. Similarly, in closing argument, the prosecutor's statement that Allen did not try to keep hold of Gerard was simply and clearly an argument that he had failed to keep Gerard around so he could testify at Allen's trial. This is not, as the government would have us conclude, citing *Donnelly v. DeChristoforo,* 416 U.S. 637, 647, 94 S.Ct. 1868, 1873, 40 L.Ed.2d 431 (1974), a matter of giving a damaging interpretation to an ambiguous remark. The prosecutor's intent to do more than raise a negative inference about Allen's credibility was apparent from the prosecutor's own words during Allen's cross examination. Nor was the prosecutor unaware of what he was doing, acknowledging beforehand that his strategy came close to raising a missing witness inference; yet in cross-examination he nevertheless referred explicitly to Allen's failure to get evidence to prove his self-defense claim and in closing arguments hammered home the same idea by emphasizing that Allen's failure to preserve such evidence belied his self-defense claim.

By focusing on Allen's failure to preserve physical evidence, moreover, the prosecutor created a strawman and then used it against Allen. It was irrelevant whether Allen preserved the van, gun, or shell casing. There was no evidence Manning fired into the van or damaged it, and it was undisputed that Allen had used a gun to shoot Manning; finding a shell casing would have proved little in and of itself since it was the location of the casing that was important, to show where the shooting took place. *Cf. United States v. Hale,* 422 U.S. 171, 180, 95 S.Ct. 2133, 2138, 45 L.Ed.2d 99 (1975) (post-arrest silence inherently ambiguous and potentially prejudicial; cannot be used for impeachment); *Walker v. United States,* 402 A.2d 424, 427 (D.C. 1979) (failure to tell parole officer of reason for flight insufficiently probative to permit cross-examination); *Sampson v. United States,* 407 A.2d 574, 576 (D.C. 1979) (defendant's omission of material fact may not be used to impeach him, unless it is omitted from defendant's prior statement where "it would have been natural to mention" the material fact and later testified to by defendant at trial); *Beale v. United States,* 465 A.2d 796, 805 (D.C. 1983), *cert. denied,* 465 U.S. 1030, 104 S.Ct. 1293, 79 L.Ed.2d 694 (1984). *See also Hill v. United States,* 404 A.2d 525, 531 (D.C. 1979), *cert. denied,* 444 U.S. 1085, 100 S.Ct. 1042, 62 L.Ed.2d 770 (1980).

Accordingly, the question is whether we can "say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946). This court has previously observed that "... where the defendant's credibility is a key issue and the missing witness inference goes to that credibility, an improper argument or instruction will ordinarily require reversal." *Thomas, supra,* 447 A.2d at 59. While we can readily agree with the government that there was strong evidence that Allen shot Manning, the government's evidence of the absence of self-defense is less impressive, relying almost entirely on the credibility of the witnesses. The only non-threats evidence offered by the government is Allen's flight to Miami after the shooting. Allen and other defense witnesses testified that Manning had a gun. Even the government's witnesses testified that Manning had invited Allen to the apartment, was edgy, was seen with a gun, was angry with Allen and without Allen's permission had sold his car and taken his tapes. Manning's girlfriend, a government witness, testified that while at Johnson's apartment Allen told Manning not to worry about the car. The resolution of whether Allen acted in self-defense in shooting Manning could only be resolved by the jury's evaluation of witnesses', including appellant's, credibility.

That Allen had the opportunity to present evidence about his efforts to locate Gerard and his inability to find the gun and the shell casings, explaining he did not see the van for two months after the shooting, does not cure the harm. *Cf. United States v. Hale,* 422 U.S. 171, 180, 95 S.Ct. 2133, 2138, 45 L.Ed.2d 99 (1975) (defendant's explanation of prior silence unlikely to overcome strong negative inference jury is likely to draw). Had the trial judge entertained defense counsel's request to rule on Gerard's availability, the judge might have found that Gerard had a Fifth Amendment privilege not to incriminate himself, since Allen claimed that Gerard also shot at Manning, drove from the scene, kept the gun, and that the gun was Gerard's, thereby precluding use of his testimony in appellant's trial. *(John) Harris v. United States,* 430 A.2d 536, 543 n. 9 (D.C.1981); *Anderson v. United States,* 352 A.2d 392, 394 n. 3 (D.C.1976). But even if Gerard did not have a right to invoke the Fifth Amendment, the prosecutor's cross-examination went beyond the purpose he proffered to the trial judge and implied, not subtlety, that Allen's nonpreservation, and necessarily his nonproduction of nonevidence, showed that he could not prove his self-defense claim The likelihood that the jury would draw negative inferences from his failures to locate Gerard and the physical evidence, much less to produce them at trial, was heightened by the prosecutor's closing arguments urging the jury to consider this nonevidence. The effect was to undermine Allen's credibility and shift to him a burden to substantiate his self-defense claim.[22]

The final instructions informed the jury that the "law does not require the defendant to prove his innocence or to produce any evidence at all." But the instructions, no more than the prosecutor's argument that the government had the burden of proof to show no self defense, did not focus on the problem identified by defense counsel, nor cure the harm, since the jury was told to consider evidence in the case without identifying the proper use of Allen's nonpreservation of a witness and physical evidence. Indeed, the trial judge's overruling of defense objections enhanced the government's position and weakened that of the defense. *See Givens, supra,* 385 A.2d at 28. Given the prosecutor's cross examination, rebuttal closing argument, and the absence of an instruction on proper use of the evidence, unlike that given with respect to Dixon's statement, see note 9, *supra,* the instructions to consider the evidence and that the government had the burden of proof were, at best, ambiguous with respect to Allen's admissions on cross examination that he had failed to find Gerard or look for the physical evidence.

Accordingly, we hold that the error was not harmless, and that Allen's convictions must be reversed.

*Reversed.*

SCHWELB, Associate Judge, concurring in part and dissenting in part:

Before President Benjamin Harrison appointed him to the Supreme Court of the United States a hundred and one years ago, Justice David Brewer served on the Supreme Court of Kansas. As a member of that tribunal, he wrote the opinion of the court in *State v. Grebe,* 17 Kan. 458 (1877). In *Grebe,* the trial judge had instructed the jury that an inference unfavorable to the defendant may arise "where evidence which would refute or explain certain facts and circumstances of a grave and suspicious nature is peculiarly within the defendant's knowledge and reach, and he makes no effort to procure that testimony." *Id.* at 459. In upholding the propriety of that instruction, the court said:

It seems to us that the clause is only a recognition of a well-understood principle of human action. The instinct of self-

---

22. The government's reliance on *Jenkins v. Anderson,* 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980), is unpersuasive in light of the court's decisions carefully limiting the use of silence or omission for impeachment of a defendant. *See, e.g., Walker v. United States,* 402 A.2d

424 (D.C.1979) (error to cross examine defendant about failure to tell parole officer that he fled not because he was guilty but because he was on parole, where that was his trial testimony).

preservation impels one in peril of the penitentiary to produce whatever testimony he may have to deliver him from such peril. Every man will do what he can to shield himself from the disgrace of a conviction of crime, and the burden of punishment. We all know this. We all expect it. Whenever then a fact is shown which tends to prove crime upon a defendant, and any explanation of such facts is in the nature of the case peculiarly within his knowledge and reach, a failure to offer an explanation must tend to create a belief that none exists. Will not a man, who can, explain that which unexplained will stamp him a criminal and consign him to the felon's cell?

*Id.*

This "undoubted general principle," II J. WIGMORE, EVIDENCE § 286, at 199 (Chadbourn ed. 1979), is at the heart of the present case, in which the question of guilt or innocence turned entirely on appellant's assertion of self-defense. In cross-examination and during closing argument, the prosecutor attempted to establish that, after Manning's death, Allen did not act like an innocent man and did not attempt to assemble information which would then have been available to him alone and which, if it existed, would arguably have supported his claim of self-defense. Because I believe that the prosecutor had the right and obligation to argue just that, and because in my view Allen suffered no preju-

dice, I respectfully dissent from the reversal of Allen's conviction.

I

Allen admitted at trial that he killed Manning but claimed to have done so to protect his own life.[1] Once Allen had introduced that issue into the case, the government was obliged to prove beyond a reasonable doubt that Allen had not acted in self-defense. Manning was dead, and his version of the encounter was not available to the jury. In order to contest Allen's proffered justification, the prosecutor was obliged to probe Allen's account to determine if it was consistent with the claim of self-defense. The prosecutor attempted to demonstrate that although Allen's words at trial supported the claim of innocence,[2] his conduct at the time of Manning's death was more consistent with guilt.

The principal issue at trial was Allen's intent. The question presented to the jury was whether Allen shot and killed Manning with criminal intent or in self-defense. Allen's intent could not "be proved directly, because there is no way of fathoming and scrutinizing the operations of the human mind." Criminal Jury Instructions for the District of Columbia, No. 3.02 (3d ed. 1978). Instead, his state of mind could best be inferred "from the surrounding circumstances." *Id.*

---

**1.** Allen's adherence to his claim of self-defense was less than consistent. In October 1985, following his apprehension in Florida, where he was living under an assumed name, Allen was returned to the District. On the way back to Washington, D.C., he initially told a detective that he did not know anything about Manning's death. Eventually, however, he changed his account and stated that Manning pulled a gun on him, that he shot at Manning, and that Gerard did the same.

On June 6, 1986, Allen entered a plea of guilty to second degree murder and carrying a pistol without a license. The record of the plea is not before us, but Allen obviously made no claim of self-defense, for he was required to admit his guilt before the plea could be accepted. Sentencing was scheduled for July 17, 1986.

While awaiting sentence, Allen wrote two letters to Judge Weisberg. In each, he explained that he was on drugs at the time of the crime

and that he was very sorry for what he had done. On each occasion, he asked the judge to be merciful. Although he mentioned in the first of these letters that "I was on drugs and I see that my life was in danger," he said nothing in either communication about having acted in self-defense or about Manning having shot at him.

On July 28, 1986, through his prior counsel, Allen filed a motion to withdraw his plea of guilty. He asserted that "the decedent, Mr. Samuel Manning, did in fact have a gun on his person on November 13, 1983, and was in fact attempting to use it against the defendant." Over the government's objection, Judge Weisberg granted Allen's motion to withdraw his plea.

**2.** Defense counsel argued to the jurors that they knew Allen had acted in self-defense, in part because Allen had told them so.

It cannot be gainsaid that, in probing Allen's intent, the prosecutor incidentally brought to the jury's attention the fact that Allen did not undertake efforts to collect or preserve evidence arguably relevant to self-defense, an issue as to which the government, not Allen, bore the burden of proof. In my opinion, however, the trial judge acted reasonably in permitting the prosecutor to do so. My colleagues say that the government's claim that it focused on Allen's failure to preserve evidence after the shooting, and that it did not propose a "missing evidence" inference, "undermines the rationale behind the law in this jurisdiction." My view is the exact converse; the extension of the "missing evidence" doctrine to reach the facts here undermines the prosecution's right to conduct a thorough exploration and exposition of relevant facts and impairs the evenhanded balance that is essential to adversarial litigation.[3]

## II

Over defense objection, the judge permitted the prosecutor to cross-examine Allen in detail about his conduct after Manning's death. Did Allen look for Gerard after the shooting? Did he ask his sister to keep the van from which he had shot Manning? Did he attempt to preserve a shell casing which may have "popped out" after he fired the fatal shot? Did he and Gerard search the van to see if there was anything in it that could support his claim that he had acted in self-defense? Did he ask Gerard to preserve the weapon with which he (Allen) had killed Manning? Did he request Gerard to keep in touch "so he could say what really happened in the van?" In his rebuttal argument, the prosecutor reemphasized that if Allen had truly acted in self-defense he would have "scoured that van to get that shell casing and to preserve the gun" and would have "tried to keep Gerard or Gerald, or know his last name." He argued that Allen "did nothing, nothing to preserve what would support him." A similar theme appeared in the prosecutor's initial argument as well.

Allen contends on appeal that "the inference the government was urging was that appellant's failure to produce the gun, the shell casing or Gerard created the presumption that the [evidence] if produced would be unfavorable." I cannot agree that the prosecutor was urging such a presumption, either directly or implicitly. Rather, the prosecutor's focus was on the plausibility of Allen's claim of self-defense in light of his pre-arrest conduct, and not on any "missing witness" or "missing evidence" inference.

During cross-examination, the prosecutor sought to show that if Allen had killed Manning justifiably in self-defense, then it would have been logical for him to do what he could to enable the authorities to find out what really happened. Specifically, the prosecutor suggested that an innocent man would have kept the gun, searched the car for clues, told his sister and brother-in-law about Manning's death, attempted with their help to preserve the van and its contents, and requested Gerard to stay in touch. Similarly, in his closing argument, the prosecutor focused on what Allen did after the killing. He did not argue or even mention Gerard's absence from the trial. As Judge Weisberg put it, such cross-examination[4] "shows the jury something about whether [Allen's] conduct is consistent with [that of] a man who tells the story he's telling here today."

**3.** "When a defendant in a criminal trial takes the stand the scope of cross-examination is very broad." *United States v. Raper*, 219 U.S.App. D.C. 243, 248, 676 F.2d 841, 846 (1982). Indeed, as the trial judge instructed the jury in *Raper*, "when you put [the defendant] on [the stand], the prosecutor can ask him anything that might have any relevance to the case. And that includes what color eyes his grandmother's cow has if it sheds any light on the issues of this case." *Id.* Obviously, this does not mean that the cross-examination can embrace privileged or otherwise proscribed matters. The importance of providing the government with a fair opportunity to cross-examine a testifying defendant, however, militates against applying here what I regard as an unwarranted extension of the missing witness and missing evidence doctrine.

**4.** And, by analogy, such argument.

As my colleagues correctly suggest, the "missing witness" and "missing evidence" principle is designed to avoid the creation of evidence from nonevidence. To put it in the vernacular, the prosecutor—or, indeed, any attorney—should not be allowed to mislead the jury by trying to make something out of nothing. In my opinion, however, that wise policy is not significantly implicated here. The government was not making something out of nothing. Rather, as the trial judge recognized, the prosecutor was asking the jury to draw reasonable inferences from Allen's conduct at a time, if ever there was one, when actions spoke louder than words.

Allen argues, not implausibly, that there were legitimate reasons for his failure to preserve evidence immediately after the killing.[5] He had every opportunity, however, to explain these reasons to the jury.[6] The overall character of Allen's conduct at the time—his failure to report Manning's death or to preserve the scene for investigators, his flight and his assumption of an assumed identity—were all relevant to an informed assessment of his state of mind. The prosecutor's concentration on this theme during cross-examination and in closing argument did not, in my view, run afoul of the "missing witness" or "missing evidence" doctrine.

It is axiomatic that the trial judge, who is on the scene and has an opportunity to obtain a "feel" for the case which is not available to an appellate court reviewing a paper record, is invested with wide latitude in determining the permissible limits of cross-examination and of closing argument. In my opinion, Allen has failed to show abuse of that discretion.

### III

Allen contends that the prosecutor impermissibly shifted the burden of proof to him with respect to the issue of self-defense. He says that this occurred both during cross-examination and in closing argument. I find this contention to be altogether unpersuasive.

Early in his instructions, the judge explained the presumption of innocence. He told the jury that the government had the burden to prove Allen's guilt beyond a reasonable doubt. He specifically stated that this burden of proof never shifts. Judge Weisberg again referred to the requirement of proof beyond a reasonable doubt on each occasion that he explained the elements of a particular offense.[7] Addressing the question of self-defense, the judge said:

> wholly unreasonable to think that after being involved in the emotionally wrenching experience of having to kill his best friend, appellant, who has no legal expertise, would immediately start keeping a list of witnesses for possible future use in court. Nor was there any reason to believe that Gerard would want to cooperate with appellant in such trial preparation or that appellant would have any reason to think he could not find Gerard if he needed him in the future.

5. Allen argues as follows in his Reply Brief: The van or condition of the van would have proved nothing since there was no testimony that Manning fired *into* the van or damaged it in any way. Preserving the gun or shell casing would have been equally meaningless since there was no dispute that the defendant used a gun to kill the decedent. The only question was why. It was the location of the shell casing, not the shell casing itself, that was important, as proof of where the shooting occurred. Thus, it would have been useless for appellant to search the van for a shell casing because having a shell casing in court does not prove where it came from, or that it was the same shell casing. The jury would still have to take appellant's word on that. Moreover, it is wholly unreasonable to expect that after the shooting, appellant could predict that, in a future trial, the location of the shooting would be in dispute and that an ejected shell casing may help prove the location. It takes lawyers and police technicians years of education and training to learn about the significance of such details.

    Gerald could have elucidated the transaction had he been available. However, it is

6. *Cf. Dixon v. United States,* 565 A.2d 72, 80 n. 15 (D.C.1989):

    > It may be appropriate to observe that the prosecutor's having argued [an allegedly improper theme] did not preclude defense counsel from arguing the contrary. In fact, defense counsel did so, forcefully and in detail. Like many other issues, this one was appropriately left to the jury to decide after each side had its say.

7. Since the judge instructed on a number of lesser included offenses, the jurors heard this several times.

The defendant is not required to prove that he acted in self-defense. Where evidence of self-defense is present, the government must prove beyond a reasonable doubt that the defendant did not act in self-defense. If you find that the government has failed to prove beyond a reasonable doubt that the defendant did not act in self-defense, it is your duty to find him not guilty. And that applies to all the levels of homicide that you may consider, depending on what you find as the facts of this case.

Given the clarity of these instructions and the ease with which any reasonable person could understand them, I would apply here Justice Holmes' observation for the court in *Graham v. United States*, 231 U.S. 474, 481, 34 S.Ct. 148, 151–52, 58 L.Ed. 319 (1913), that "[i]t would be absurd to upset a verdict upon a speculation that the jury did not do their duty and follow the instructions of the court." *See also Coates v. United States*, 558 A.2d 1148, 1150 (D.C. 1989).

Judge Weisberg also instructed the jurors that "it is your duty to accept the law as I state it to you." Accordingly, even if the prosecutor had argued that Allen had the burden of proof with respect to self-defense, one would presume that the jury applied the law as stated by the judge, not by the prosecutor. In any event, the prosecutor presented no such contention.[8] On the contrary, he began his rebuttal argument by agreeing that

[Defense counsel] is right. The government has to prove and you have to be satisfied beyond a reasonable doubt as to every element of the offenses of first-degree murder or of second-degree murder or voluntary manslaughter while armed. And *you have to be satisfied beyond a reasonable doubt, if there's evidence of self-defense, that he didn't act in self-defense.*

(Emphasis added.) Since the judge, the prosecutor and the defense attorney[9] were all in agreement on this undisputed point of law, I am at a loss to understand how the jurors could possibly have been misled as to which party had the burden of proof. Probative evidence[10] should not be excluded because of "crabbed notions of relevance or excessive mistrust of juries." *Riordan v. Kempiners*, 831 F.2d 690, 698 (7th Cir.1987) (Posner, J.).

It is, of course, true that the prosecutor had the burden of proof with respect to the issue of self-defense and that his cross-examination and closing argument revealed the lack of evidence presented by the defense on that subject. That is by no means equivalent, however, to an attempt to "shift" the burden. As Professor Wigmore has written,

it is true that the burden is on the prosecution ... and that the accused is not required by any rule of law to produce evidence. But nevertheless he runs the risk of an [adverse] inference from nonproduction.

VIII WIGMORE, *supra*, § 2273, at 450.[11] In *McCowan v. United States*, 458 A.2d 1191,

---

**8.** On one occasion, the prosecutor, in what the judge later characterized as a "slip of the tongue," asked Allen if he and Gerard had searched the van to determine if there was anything in it that could help prove that he acted in self-defense. The question was interrupted by an objection. The judge stated that *"he doesn't have to prove it."* Later, contradicting a defense contention that the jury had not heard this remark, the judge stated that "I barked it out." Although the majority fails explicitly to acknowledge the point, see maj. op. at 231 n. 17, I think the judge's description of his tone of voice amounted to a judicial finding that the juror heard him correct the prosecutor's statement and that the problem was therefore resolved on the spot. Since there is no evidence to the contrary, the judge's finding is binding on us.

**9.** As one might expect, defense counsel energetically emphasized to the jury that the government had the burden to prove guilt beyond a reasonable doubt on all issues, specifically including the issue of self-defense.

**10.** And arguments based on reasonable inferences from such evidence.

**11.** Wigmore also differentiates between "the generally prohibited inference from the accused's *own failure to testify* by claiming privilege, and the permissible inference from his *failure to produce other evidence.* II WIGMORE, *supra*, at § 290, at 215 (emphasis in original). A prosecutor may comment on the failure of the *defense*, as opposed to the defendant, to counter or explain the evidence. *United States v. Borchardt*, 809 F.2d 1115, 1119 (5th Cir.1987).

1197 (D.C.1983)—a case not discussed by the majority—this court resolved a very similar issue as follows:

> Appellant also claims that the prosecutor erroneously represented to the jury during argument that he bore a burden of proof regarding his inability to explain his whereabouts on July 8. Our reading of the record indicates, to the contrary, that the prosecutor's argument was directed at the unreasonableness of appellant's limited attempts to ascertain his whereabouts. It did not assert, explicitly or implicitly, that appellant was burdened with proving his whereabouts. *Cf. Whalen v. United States*, 379 A.2d 1152, 1165 (D.C.1977) (prosecutor's closing is proper where it refers to appellant's inability, prior to trial, to explain his whereabouts to a co-worker and does not refer to appellant's failure to testify at trial), *rev'd on other grounds*, 445 U.S. 684, 100 S.Ct. 1432, 63 L.Ed.2d 715. (1980).

> \* \* \* \* \* \*

> The court, moreover, instructed the jury several times that appellant bore no burden of proof. We presume the jury understood and followed those instructions.

(Citations omitted.) *See also United States v. Sensi*, 279 U.S.App.D.C. 42, 879 F.2d 888, 899–900 (1989) (prosecutor's comment that defendant's testimony was corroborated only by witnesses that he "never produced at this trial" did not shift the burden of proof); *United States v. John-*

son, 713 F.2d 633, 651 (11th Cir.1983) (prosecutor's emphasis on defense's failure to produce evidence to rebut reasonable inference from government's evidence was proper where prosecutor acknowledged that government bore burden of proof and trial judge so instructed), *cert. denied*, 465 U.S. 1081, 104 S.Ct. 1447, 79 L.Ed.2d 766 (1984); *United States v. Glantz*, 810 F.2d 316, 321 (1st Cir.) (prosecutor may comment on defendant's failure to produce evidence supporting his theory of the case and may attack the weak evidentiary foundation on which the defense rests),[12] *cert. denied*, 482 U.S. 929, 107 S.Ct. 3214, 96 L.Ed.2d 701 (1987); *United States v. Gotchis*, 803 F.2d 74, 79–81 (2d Cir.1986) (prosecutor's comment that the defendant could have produced but did not produce evidence that he was a cocaine user and that drugs in his possession were not for distribution did not suggest that the defendant had an obligation to produce those witnesses or shift the burden of proof).[13]

This court has on occasion, most recently in its 2:1 decision in *Harris v. United States*, 572 A.2d 421, 425 (D.C.1990), *pet. for reh. pending*, intimated that an argument by the prosecutor about the defense's failure to present particular evidence may "shift the burden of proof and jeopardize the fairness of appellant's trial." Whatever the merits of that suggestion—and, for reasons stated herein, it is one which I think this court should re-examine [14]—it

---

When a defendant testifies, as Allen did, on the merits of the case, the prosecutor may comment on his failure to explain or deny incriminating facts already in evidence. *McGahee v. Massey*, 667 F.2d 1357, 1362 (11th Cir.), *cert. denied*, 459 U.S. 943, 103 S.Ct. 255, 74 L.Ed.2d 199 (1982).

**12.** Since the judge instructed the jury, and the prosecutor acknowledged, that the government bore the burden of proof as to self-defense, and since the *McCowan* and the other cases cited permit comment on omissions from, and the weakness of, the defense case, I cannot agree with my colleagues' view that the judge's instruction "did not focus on the problem identified by defense counsel." Maj. op. at 230. The court's instruction as to which party had the burden applied to any situation that arose, whether defense counsel "identified" it or not.

**13.** Since, in the present case, the prosecutor's reference was to what Allen failed to preserve at

the time of Manning's death, rather than to what he failed to present to the court, the reasoning of *Sensi, Johnson, Glantz* and *Gotchis* applies *a fortiori*.

**14.** The government's burden of proof beyond a reasonable doubt "provides concrete substance for the presumption of innocence," *In re Winship*, 397 U.S. 358, 363, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970), which in turn describes "the right of the accused to 'remain inactive and secure, until the prosecution has taken up its burden and produced evidence and effected persuasion.'" *Taylor v. Kentucky*, 436 U.S. 478, 483 n. 12, 98 S.Ct. 1930, 1934 n. 12, 56 L.Ed.2d 468 (1978) (quoting J. WIGMORE, EVIDENCE § 2511, at 407 (3d ed. 1940)). That right to "remain inactive and secure," however, manifestly does not prevent the prosecutor from attacking the defendant's credibility when he takes the stand, *see* note 3, *supra*, or probing the inconsistency

surely presupposes a violation of the "missing witness" or "missing evidence" rule. Since, in my view, there was no such violation here, the quoted language from *Harris* does not come into play.

## IV

Even if the prosecutor's allusions to Allen's conduct after Manning's death were improper—and I do not think they were—I would nevertheless vote for affirmance, for I am satisfied that any such impropriety was harmless. Surely, the prosecutor's cross-examination and closing argument did not rise "to the level of serious misconduct which reasonably could be viewed as having swayed the jury." *Arnold v. United States,* 511 A.2d 399, 414 (D.C.1986) (quoting *Hammill v. United States,* 498 A.2d 551, 555 (D.C.1985)).

The trial judge permitted Allen to present evidence regarding his efforts to locate Gerard. Allen also explained his inability to find the gun and the shell casings, pointing out that he did not see the van for approximately two months after the shooting. Thus, on a subject which Allen himself views as collateral or even bogus, *see* note 4, *supra,* the jury heard the prosecutor's questions and arguments and Allen's sworn testimony.[15] Since the trial judge instructed the jury that the testimony of the witnesses was evidence, but that the questions and arguments of counsel were not, and since no explicit "missing witness" or "missing evidence" argument was made, I find it difficult to discern how Allen could have been prejudiced.

The challenged cross-examination and arguments constituted only a small part of the record in a week-long, spiritedly contested trial. My colleagues acknowledge

that it was proper for the prosecutor to cross-examine Allen about his flight, his assumed identity, his false statements to the authorities, and his alleged threats to witnesses. It is difficult to escape the conclusion that a reasonable juror would view these aspects of Allen's conduct after the killing far more gravely than his alleged failure to preserve evidence, which Allen was given the opportunity to, and did, explain.

My colleagues say that the government's case was not strong on the issue of self-defense. It may be of little consequence that I disagree. The strength of the evidence is more effectively assessed by jurors who were present and had an opportunity to assess the credibility of the witnesses in the flesh-and-blood context of the courtroom than by judges who are compelled to operate in the rarefied atmosphere of appellate review, and who see the printed word rather than the faces of those who told their stories to the jury. Nevertheless, I quote the following from the government's brief, which in my view characterizes the prosecution evidence[16] with reasonable objectivity:

> Prior to the shooting, appellant had said he intended to kill Manning. Two eyewitnesses testified about the shooting and related that it occurred in a manner entirely different from that described by appellant. The evidence also showed that appellant fled the scene immediately following the killing and shortly thereafter telephoned Johnson's apartment to ask about Manning. When he was told that he had killed Manning and that the police were there, appellant hung up. Appellant later fled the District of Columbia to Miami, Florida, and attempted to establish a new identity. When he

of an affirmative defense with the defendant's own conduct in the wake of the conceded killing.

**15.** My colleagues cite *United States v. Hale,* 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1980), for the proposition that permitting the defendant to explain post-arrest silence will not cure the infringement of his constitutional privilege against self-incrimination occasioned by the prosecutor's questioning of him on that subject.

That decision turned on the applicability of "grave constitutional overtones," *id.* at 180 n. 7, 95 S.Ct. at 2138 n. 7, which are not present here.

**16.** I have no quarrel with my colleagues' recitation of the defense evidence. Maj. op. at 227–228. I believe, however, that Allen's lies and contradictions are an important part of the overall picture in our attempt, from a distance, to assess the overall strength of the case for the prosecution and the response from the defense.

was finally apprehended in Florida, he denied being Claude Allen and denied knowing anything about the killing of Manning.[17] Then, while awaiting trial in the District of Columbia, appellant threatened to harm one of the eye-witnesses and her boyfriend if she testified against appellant.

Allen was substantially impeached. He contradicted himself on a number of issues. In particular, he told an officer that Gerard shot at Manning but testified that Gerard did not. His credibility was further undermined by his admission that he obtained false papers, including a false birth certificate, from an unidentified lawyer for $150. Given these facts and the powerful inference of consciousness of guilt arising from his false protestations of innocence following his apprehension, *see* note 14, *supra*, the prosecution's case seems to me to be a good deal stronger than my colleagues suggest.

In *Thomas v. United States*, 447 A.2d 52, 59 (D.C.1982), this court stated that "where the defendant's credibility is a key issue and the missing witness inference goes to that credibility, an improper argument or instruction will ordinarily require reversal." We have, however, appropriately retained some flexibility in this regard. In *Lemon v. United States*, 564 A.2d 1368 (D.C.1989), for example, the prosecutor made what we characterized as almost a "complete" missing witness argument. Moreover, he did so in part with respect to witnesses who were in the courthouse and available to testify for either side. Nevertheless, we affirmed the defendant's conviction because the evidence against him was compelling and because

[t]he absence from the witness stand of all but one of the persons who were supposed to have been with [the defendant] on the night of the crime would have been obvious to the jury no matter what the prosecutor said, and the judge correctly instructed the jury that the government had the burden of proof beyond a reasonable doubt and that the defendant had no obligation to prove anything.

*Id.* at 1376.

With due respect to my colleagues on an issue which often divides the court, I think we should place more trust in the ability of jurors to apply their common sense and good judgment to the case at hand and to base their verdict on the evidence rather than on assertedly improper arguments by attorneys. Professor McCormick has stated, and I agree, that "[i]t is wiser to hold that if an argument on failure to produce proof is fallacious, the remedy is the usual one, namely the answering argument and the jury's good sense." E. CLEARY, McCOR-MICK ON EVIDENCE § 272, at 807–08 (3d ed. 1984).

Proportionality is of consummate importance in judicious adjudication. The Mikado's "object all sublime" to let the punishment fit the crime should apply to prosecutorial errors as well as to the misdeeds of those who transgress our criminal statutes. In determining whether reversal is proportionate to the alleged violation in this case, we might do well to be guided by the wisdom of Judge Learned Hand. In *United States v. Cotter*, 60 F.2d 689 (2d Cir. 1932), the appellant demanded that his conviction be reversed because the trial judge had declined to instruct the jury to disregard the prosecutor's argument based on

---

**17.** "False exculpatory statements made to law enforcement officers constitute independent circumstantial evidence of guilty consciousness." *Irick v. United States*, 565 A.2d 26, 30 n. 8 (D.C.1989) (citations omitted). As Dean Wigmore has compellingly explained,

It has always been understood—the inference, indeed, is one of the simplest in human experience—that a party's *falsehood* or *other fraud* in the preparation and presentation of his cause, his fabrication or suppression of evidence by bribery or spoliation, and all similar conduct is receivable against him as an indication of his consciousness that his case is a weak or unfounded one; and from that consciousness may be inferred the fact itself of the cause's lack of truth and merit. *The inference thus does not necessarily apply to any specific fact in the cause, but operates, indefinitely though strongly, against the whole mass of alleged facts constituting his cause.*

II WIGMORE, *supra*, § 278, at 133 (emphasis added to last sentence only).

the defendant's failure to call witnesses. In his opinion for the court affirming the conviction, Judge Hand wrote that

> [a] judge is not required to intervene here any more than in any other issue of fact. He must indeed, as he always must, keep the prosecution in a criminal case within bounds; ... just as he must keep passion out of the debate and hold the parties to the issues. But he is not charged with correcting their *non sequiturs; the jury are to find these for themselves.*

*Id.* at 692 (emphasis added).

Nor is Judge Hand's assessment obsolete; as the Supreme Court reiterated in *Boyde v. California,* — U.S. —, —, 110 S.Ct. 1190, 1200, 108 L.Ed.2d 316 (1990), only a few months ago,

> arguments of counsel generally carry less weight with a jury than do instructions from the court. The former are usually billed in advance to the jury as matters of argument, not evidence, [citation to transcript omitted], and are likely viewed as the statements of advocates; the latter, we have often recognized, are viewed as definitive and binding statements of the law.

(Citations omitted). In this case, as we have noted, the judge made it crystal clear that the defendant did not have to prove anything.

"There being, [in my opinion], no appreciable possibility that the [prosecutor's allegedly improper tactics] contributed to [Allen's] conviction, it would be a waste of time and resources, and might imperil justice, to try him all over again." *Helm v. United States,* 555 A.2d 465, 469 (D.C. 1989). "It is not always so easy for the government to reassemble its witnesses and evidence for a return match, or for witnesses to remember what happened many years ago." *Id.* at 469 n. 9.[18] Moreover, "the addition of an old case to an overloaded docket requires the deferral of newer ones, in some of which presumptively innocent defendants may be in pretrial detention." *Scott v. United States,* 559 A.2d 745, 766 (D.C.1989) (*en banc*) (concurring opinion). Finally, appellate reversal of a conviction for an alleged error which has played no role in bringing about the judgment—which, in my view, is exactly what has occurred here—"encourages litigants to abuse the judicial process and bestirs the public to ridicule it." *Delaware v. Van Arsdall,* 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986).

Men and women are finite beings. Perfection is a rare commodity. Courts should treat as a meaningful guide to judicial analysis, rather than as mere rhetorical flourish, the Supreme Court's oft-repeated directive that a criminal defendant has a right to a fair trial, not a perfect one. *See, e.g., Ross v. Oklahoma,* 487 U.S. 81, 91, 108 S.Ct. 2273, 2280, 101 L.Ed.2d 80 (1988), quoted in *Dixon v. United States,* 565 A.2d 72, 81 (D.C.1989). Believing that Allen received all of the protections to which he was entitled, I would affirm his conviction.[19]

---

**18.** In the present case, these difficulties are compounded by delays occasioned not only by Allen's flight and concealment, but also by his original plea of guilty to second degree murder and to carrying a pistol without a license, later withdrawn. It is now more than six and a half years since Manning's death.

**19.** I am troubled by the potential prejudice to Allen occasioned by the admission of Annie Johnson's testimony that she heard a third person tell Manning that Allen was going to kill Manning. In my view, the trial judge's limiting instruction with respect to the purpose for which this evidence may be considered, *see* maj. op. at 228–229 n. 9, might be a great deal more difficult for reasonable (but nevertheless human) jurors to follow than the far less taxing directive defining the burden of proof. I note that Judge Weisberg originally ordered the challenged testimony stricken, but subsequently changed his mind after hearing argument of counsel. Although I agree with my colleagues that there was no abuse of discretion, the judge will surely, in the event of a new trial, be authorized to re-weigh the probative value of the evidence against its prejudicial effect, *cf.* Rule 403 of the Federal Rules of Evidence, in

the new context which will arise as the evidence    is presented once again.