**Peter REGALADO, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 88–72.

District of Columbia Court of Appeals.

Submitted Jan. 3, 1990.

Decided March 16, 1990.

Janell M. Wolfe, Falls Church, Va., appointed by this court, was on the brief, for appellant.

Jay B. Stephens, U.S. Atty., and John R. Fisher, Thomas J. Tourish, Nancy Woodward, Washington, D.C., and Oscar S. Mayers, Jr., Asst. U.S. Attys., were on the brief, for appellee.

Before ROGERS, Chief Judge, and SCHWELB, Associate Judge, and KERN, Senior Judge.

ROGERS, Chief Judge:

Appellant Peter Regalado appeals from his conviction by a jury of cruelty to animals, D.C.Code § 22–801 (1989 Repl.)[1], on the ground that the evidence was insufficient to sustain a conviction. Specifically, he contends that there was insufficient evidence of specific intent. We hold that the statute requires only proof of general intent with malice, and accordingly, we affirm.

### I

On June 29, 1987, Keith Hall was eating breakfast at his home in the 1500 block of Kingman Place, N.W., when he heard the "cries of [a] puppy" dog from outside. Hall, manager of a division of a major computer company, described the cries as those of a "puppy in distress, a puppy, [sic] hurt. Scream of a dog, a young dog." Hall and his roommate went outside to investigate the noise and observed appellant in the yard next door beating a puppy. Appellant was "holding the puppy by a leash, a tied rope, in the air, suspending and being held up by his jaw in a choking manner ... and with his right hand—holding with his left hand and with his right hand hitting the puppy in a manner that caused it to swing and to—hitting it very hard." Hall saw appellant hit the puppy in this manner four or five times in a period of no more than two minutes. According to Hall, appellant was very "angry and out of control."

Hall yelled to appellant to stop beating the puppy, but appellant merely responded by telling Hall to get off his back. Hall continued to yell at appellant to stop, that "the dog doesn't understand," and eventually appellant ceased the beating. Hall then called the Humane Society to report what [he] "felt was violence against a dog that should not have happened."

Donna Kessler, a Washington Humane Society Officer and program assistant to the chief of animal disease, arrived at 1514 Kingman Place, N.W., within fifteen to twenty minutes of receiving a complaint that a puppy was being beaten in the rear yard. After speaking with appellant, who admitted hitting the puppy, but explained that the injuries to the dog's face were a result of the dog being injured a week earlier by a car, Kessler went to the back yard. There she saw the puppy tied to the railing of the steps in a manner "so tangled, the puppy could not move at all." While both Kessler and appellant were attempting to extricate the puppy from the entangled leash, appellant slapped the puppy again on the face, telling Kessler that this is what he had done.[2] Fearing for the puppy's safety, Kessler removed the puppy, which she estimated was three months old and weighed ten to twelve pounds, took three pictures of the puppy, and transported it to McArthur Animal Hospital. Kessler testified that she noticed that the puppy's eye was severely bloodshot and appeared swollen, "so swollen that it was covering part of the eye." She also testified that appellant had dealt with another Humane Society officer.

Dr. Morris, a veterinarian for ten years in the District of Columbia, handling predominantly dogs and cats, qualified as an expert in the area of veterinary medicine. He testified that when he treated the puppy, a twelve week old German Shepherd, black-mix, on June 29, 1987, he noticed "several lesions, of different types [;] the

---

**1.** D.C.Code § 22–801 defines cruelty to animals as:

> Whoever overdrives, overloads, drives when overloaded, overworks, tortures, torments, deprives of necessary sustenance, cruelly beats, mutilates, or cruelly kills or causes or procures to be so overdriven, overloaded, driven when overloaded, overworked, tortured, tormented, deprived of necessary sustenance, cruelly beaten, mutilated, or cruelly killed any animal, and whoever, having the charge or custody of any animal, either as owner or otherwise, inflicts unnecessary cruelty upon the same, or unnecessarily fails to provide the same with proper food, drink, shelter, or protection from the weather, shall for every such offense be punished by imprisonment in jail not exceeding 1 year, or by fine not exceeding $250, or by both such fine and imprisonment.

**2.** The trial judge sustained an objection to Kessler's statement that "[a]t that point, I knew that I needed to get the puppy out of there," advising the witness to tell what she did, and not to give any opinions that she had.

most dramatic, most obvious was a swollen left eye with a lot of hemorrhage of the conjunctiva, and nictateans." The puppy also had a swollen right eye but with a less dramatic lesion, "[h]is muscle was swollen, cellulite type of swelling, no hemorrhage involved," and had some old excoriations, old healing scrapings on his left front leg. In lay terms, the doctor explained, the face was generally swollen and puffy, the muscle lesions being more of an inflammation, but the lesions about the eye were bloody and bruised.

After indicating that his education and practice trained him to determine how recently an injury has occurred, Dr. Morris opined that the puppy's injuries were inconsistent with being hit by a car two days before treatment. He explained that the lesions above the eyes were "much more recent than two days," occurring within 24 hours or 12 hours before, while the lesions on the lips were healed sufficiently that the scab was beginning to loosen at the edges, indicating an injury of five to seven days earlier. He further explained that the lesion about the eye was consistent with having been hit about the face since it was a lesion of a "blunt trauma, heavy trauma."

The trial judge denied appellant's motion for a judgment of acquittal, and appellant called five witnesses in addition to testifying himself. Efraim Rivera testified that on June 26, 1987, he observed a taxi cab hit a black puppy fitting the description of the puppy that appellant had allegedly beaten. According to Rivera, appellant, who was walking in the vicinity of the accident, put the dog in a box and carried it away. Rivera looked at three pictures of a puppy, and although he stated the pictures looked like the same puppy that was hit by the car, he could not positively identify the pictures as the same dog.

Robert Peter George, an abbot in the monastery at 1514 Kingman Place, N.W.,

see note 3, *infra*, testified that on the evening of June 26, 1987, he and appellant were walking down the street when they heard a dog yelling. George and appellant investigated and learned that a puppy had been hit by a taxicab. After appellant transported the puppy back to the monastery, George noticed that the puppy's paws were bloody. He testified further that although he had never seen appellant torture or administer any cruel beatings to the puppy he had observed appellant attempting to housebreak and discipline the puppy by hitting it on the nose with a rolled up newspaper. On cross-examination George admitted that on the morning of June 29, 1987, he saw appellant holding the puppy suspended off the ground, hitting him in the nose.

Gary Bridgeforth and Antonio Lucas, nine year old boys who lived near 1514 Kingman Place, N.W., testified that on the evening of June 26, 1987, they saw appellant carrying a puppy in a box. Appellant told the boys that a taxicab had hit the puppy. Both boys were shown photographs of the puppy impounded on June 29, 1987, by the Humane Society, but they stated that the animal in the pictures looked like another puppy.

James Webb, a live-in custodian at the monastery at 1514 Kingman Place, N.W. from 1985 through 1987, testified that he saw appellant chastise the puppy for defecating and urinating on the floor of the monastery but did not observe appellant mistreat the puppy.

Appellant, age 42, testified that on the evening of June 26, 1987, he was walking with Robert George when they heard a dog yelping.[3] A black German Shepherd, about six weeks old, was lying on the ground with blood coming out of his snout and paws. Appellant placed the puppy in a box and took the puppy to the monastery, where he "proceeded to treat or nurse the

---

**3.** Appellant testified that he has a Master of Arts degree in philosophy and religion and a Masters of Divinity. He also testified that he is Bishop of the Catholic Orthodox Church, which he explained is not a Roman Catholic Church, and is in charge of the spiritual environment at the Holy Cross Monastery at 1514 Kingman Place, N.W. The monastery is in a row house in the Logan Circle area. Appellant testified that he told the Humane Society officer that he was a member of the Society.

puppy, to clean his wounds and so forth." Thereafter, appellant tried to house train the dog. On June 29, 1987, the puppy defecated on the floor of the monastery and appellant whacked the puppy on his snout with a rolled bunch of newspapers. Appellant then put the puppy in the back yard where it proceeded to chew an expensive plant. Appellant "grabbed the puppy and whacked it again" and the puppy's yelps brought Mr. Hall outside to investigate.

In looking at the photographs, appellant noted dissimilarities, testifying that the puppy he took to the monastery had white mitten paws while the paws of the dog in the photographs had black mitten paws. Appellant "[c]ategorically" denied that the puppy in the photographs was the puppy taken from his house. He also denied hanging the puppy by the leash while he was outside in the yard or cruelly beating, torturing, or tormenting the dog.[4] On cross examination, however, appellant admitted being in possession of the puppy that is the subject of the charges against him. He also denied that the incident described by his neighbor, Hall, ever took place.

The jury convicted appellant as charged.

## II

Appellant's contention that the evidence was insufficient turns on his claim that the government failed to prove that he had the specific intent to harm the puppy. D.C. Code § 22–801 makes cruelty to animals punishable by a jail term "not exceeding 1 year or by fine not exceeding $250, or by both such fine or imprisonment." The statute, however, does not designate the *mens*

rea (*i.e.*, specific intent, general intent etc.) necessary for conviction. The trial judge instructed the jury that it was required to find that appellant "willfully" mistreated the puppy. This instruction was based on the instruction for cruelty to children under D.C.Code § 22–901 (1989 Repl.),[5] which this court held in *Carson v. United States*, 556 A.2d 1076, 1078 (D.C.1989), to be a general intent crime but requiring proof of malice. The *Carson* court noted that the terms "abuse" and "willfully mistreat" had been interpreted to " 'call[ ] for something worse than good intentions coupled with bad judgment,' and incorporate 'the requirement of an evil state of mind....' " 556 A.2d at 1078 (quoting *Mullen v. United States*, 105 U.S.App.D.C. 25, 26, 263 F.2d 275, 276 (1959), also citing *United States v. Thomas*, 148 U.S.App.D.C. 148, 459 F.2d 1172 (1972)). The *Carson* court concluded that prior decisions indicated that the crime was more than a general intent crime but less than a specific intent crime, *id.*, and, by analogy to our equating of the terms "evil intent" and "malice" in other contexts, *see United States v. Bradford*, 344 A.2d 208 (D.C.1975) (manslaughter requires malice or "evil design"), held that the "something more [required by the cruelty to children statute] would seem to be malice." *Carson, supra*, 556 A.2d at 1078.[6] Finally, the court noted that the standard of general intent with malice advances the essential purpose of the statute because it "offers children the protection of the statute ... while ... not undermining the domestic authority of parents." *Id.* at 1079.

Like the cruelty to children statute, § 22–901, there is a dearth of case law interpreting § 22–801. In *Jordan v. Unit-*

---

**4.** The trial judge observed that he was troubled by the case because he "had a strong feeling" that the defense had changed its defense upon being surprised when the witnesses, Gary Bridgeforth, Delores Bridgeforth (Gary's mother), and Antonio Lucas, failed to identify the dog in the photographs as the dog in the accident. This observation came towards the end of a discussion of the government's mid-trial request to introduce prior bad acts evidence that the Human Society had previously removed a dog from appellant's home after receiving a complaint about how the dog was being treated

by appellant; the judge denied the government's request.

**5.** *See* Instruction No. 4.18, Cruelty to Children, D.C.Code § 22–901, Criminal Jury Instructions (3rd E. Greene & Guidoboni), Young Lawyer's Section, Bar Association of the District of Columbia, at 166.

**6.** The court also noted the common law roots of the statute. *Id.* at 1078–79 (referring to the Maryland statute which incorporates the Maryland common law).

*ed States,* 269 A.2d 848, 849 (D.C.1970), the court reversed a conviction in view of the absence of expert testimony that a dog was mistreated by being left outside in sub-zero weather. In *Tuck v. United States,* 467 A.2d 727, 730–33 (D.C.1983), the only other case interpreting § 22–801, the court upheld the statute against a constitutional challenge on grounds of vagueness. Decisions in other jurisdictions, however, have held that proof of an intention to inflict injury or cause pain or suffering is not an essential ingredient of active cruelty consisting of torturing or tormenting, or cruelly beating or killing an animal, and that the offense is complete where one intentionally, knowingly, and without justifiable cause voluntarily commits acts which unnecessarily inflict pain and suffering upon the animal. *See Rushin v. State,* 154 Ga.App. 41, 267 S.E.2d 473 (1980); *In re G,* 52 Md.App. 131, 447 A.2d 493 (1982). These courts have concluded that when an animal protection statute requires that the prohibited act be done willfully, wantonly, or with intent to ill use the animal or subject it to unnecessary pain and suffering, then there must be proof that the act complained of was intentional, as distinguished from accidental or involuntary, or that the accused was actuated by a malevolent purpose or reckless disregard of the consequences. *See People v. Olary,* 10 Mich.App. 640, 160 N.W.2d 348, *affirmed,* 382 Mich. 559, 170 N.W.2d 842 (1969); *State v. Brookshire,* 355 S.W.2d 333 (Mo.App.1962); *Yopp v. State,* 79 Ga.App. 584, 54 S.E.2d 505 (1949).

Unlike cruelty to children, cruelty to animals was not an offense at common law.[7] It has only been since the early part of the twentieth century that most jurisdictions began enacting statutes for the protection of animals without regard to ownership. *See* Annotation, *Cruelty to Animals,* 82 A.L.R.2d 794, 797–99 (1962).[8] Thus, although children are doubtless deserving of greater protection than animals,[9] the rationale in *Carson, supra,* 556 A.2d at 1079, regarding the social policy that is enhanced by requiring a general intent with malice, is applicable here. Statutes enacted for the protection of animals from cruelty were not intended to place unreasonable restrictions on the infliction of such pain as may be necessary for the training or discipline of an animal. *See, e.g., State v. Fowler,* 22 N.C.App. 144, 205 S.E.2d 749 (1974).[10] On the other hand, there is a distinction between discipline and training and a beating or a needless infliction of pain accompanied by a cruel disposition. Accordingly, we are not persuaded that § 22–801 should be interpreted to require proof of specific intent to injure or abuse. The specific intent requirement would offer the animal owner the greatest protection, but the general intent with malice requirement reflects the growing concern in the law for the protection of animals, while at the same time acknowledging that humans have a great deal of discretion with respect to the treatment of their animals.

### III

Accordingly, we find meritless appellant's contention that the evidence was insufficient to convict him of cruelty to animals. The jury could reasonably find from the evidence that appellant acted "willfully" in an attempt to harm the pup-

---

7. Under the early common law animals were possessed of no inherent right to protection from the brutality or wanton abuse of man. *See McCausland v. People,* 58 Colo. 303, 145 P. 685 (1914); *Waters v. People,* 23 Colo. 33, 46 P. 112 (1896). If, however, a person in the course of abusing or mistreating his or her own animal infringed on or impaired the property rights of another, then that person would be liable for trespass.

8. *See generally* Note, *Legal Definitions of Cruelty and Animal Rights,* 7 B.C. Envt'l Aff. L.Rev. 147 (1976) (discussing the establishment of new legal standards which reflect a general concern for animals and provide more realistic remedies).

9. *See* Goodkin, *The Evolution of Animal Rights,* 18 Colum. Hum. Rts. L.Rev. 259, 260 (1987); *see also* 31A C.J.S. *Animals,* § 99.

10. *See Tinsley v. State,* 22 S.W. 39 (Tex.Crim. 1893) (defendant repeatedly beat his horse over the head and body with a six feet long log to teach it obedience); *Stephens v. State,* 65 Miss. 329, 3 So. 458 (1887) (animal protection statutes were not intended to interfere, and do not interfere, with the necessary discipline of animals).

py.[11] As *Carson, supra,* makes clear proof of malice will usually be circumstantial, and the line between discipline and cruelty will often be difficult to draw. 556 A.2d at 1079–80.

The government's three witnesses offered evidence to support a finding of malice. Hall described both the effect on the puppy and appellant's state of mind. Kessler's reaction to appellant's demonstration of how he had beaten the puppy supported an inference of discipline crossing over the line to cruelty. Dr. Morris' testimony of the extent and nature of the injuries also supported the inference.

The defense witnesses' explanation that a taxicab had injured the dog did not explain the lesions around the eyes, nor did it detract from the expert testimony about the severity of the lesions or the time of their infliction. Moreover, appellant seriously undermined his credibility by his internally inconsistent testimony, claiming initially that the puppy had received its injuries as a result of an accident involving a taxicab and later claiming that two different puppies were involved.

Accordingly, the judgment is affirmed.

---

**11.** When a defendant moves for a motion for judgment of acquittal on the grounds of insufficient evidence, the trial court must not only view the evidence in the light most favorable to the government, but must give full play to the "right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, and making no distinction between direct and circumstantial evidence." *Curry v. United States,* 520 A.2d 255, 263 (D.C.1987); *see Shelton v. United States,* 505 A.2d 767, 769 (D.C.1986). It is only where there is no evidence upon which a reasonable mind could fairly conclude guilt beyond a reasonable doubt that a judgment of acquittal is properly granted. *United States v. Watson,* 501 A.2d 791, 792 (D.C.1985); *Williams v. United States,* 357 A.2d 865, 867 (D.C.1976).