[No. D043471. Fourth Dist., Div. One. Jan. 20, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
MANUEL ALVARADO, Defendant and Appellant.

COUNSEL

Arthur B. Martin, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Holley A. Hoffman and Marvin E. Mizell, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**NARES, Acting P. J.**— ■ The issue presented in this case is one of first impression: Is the crime of animal cruelty, as defined in Penal Code section 597, subdivision (a),[1] a general or specific intent crime? We conclude, based upon the language of the statute, relevant California authority, and persuasive out-of-state authority, that section 597, subdivision (a) describes a general intent crime.

## FACTUAL AND PROCEDURAL BACKGROUND

In December 2002 Manuel Alvarado lived with his girlfriend, Mary Duarte, and her brother, Gregory Ballew, in a small studio apartment located on an estate in Fallbrook owned by Roy Johnson. Because Alvarado did various work projects at the estate, Johnson did not charge them rent for the apartment. Alvarado and Duarte had two dogs, a three-year-old Dalmatian named Pyro and a seven-month-old Chow-Labrador mix named Gizmo, and Ballew had a Pekinese named Dixie, all of which also lived in the apartment.

On December 6, 2002, Alvarado and Ballew were at the apartment while Duarte was at work. During the day, the men split an 18-pack of beer. That evening, they went to a bar in Rainbow, a nearby town, and drank a pitcher of beer. After the bartender refused to serve Alvarado any more alcohol, Alvarado drove himself and Ballew home. Arriving back at the apartment, Alvarado went inside while Ballew stayed outside to smoke.

After approximately 30 minutes, Ballew went into the apartment and discovered overturned furniture and specks of blood on the floor. Alvarado was in the bathroom, which had blood on the floor and the toilet. He was crying and mumbling as he rinsed Gizmo, who was in the bathtub, bleeding. Ballew punched Alvarado in the back of the head, saying, "What the fuck did

---

[1] All further statutory references are to the Penal Code.

you do?" and shoved Alvarado, causing Alvarado to fall back onto the toilet. Ballew grabbed Dixie and the cordless phone and ran outside, where he hid in the bushes and called his ex-girlfriend for a ride.

The ex-girlfriend's daughter picked Ballew up and took him to Duarte's workplace. Drunk and angry, Ballew told Duarte that Alvarado was killing Gizmo and demanded that she call the sheriff's department. Duarte called a coworker to come relieve her so she could go home, but the coworker was not available for several hours. Duarte called the apartment four or five times, but no one answered, so she called the sheriff's department just after 10 p.m.

About a half hour later, Alvarado showed up at Duarte's workplace, crying uncontrollably and saying that Pyro was dead. When Duarte asked what had happened to Pyro, Alvarado just kept repeating that his "baby" was dead, although he ultimately told Duarte that he had thrown Pyro's body by the shed. Duarte told Alvarado to go home and that she would join him once her coworker arrived. Just after Alvarado left, Duarte called the sheriff's department again.

Deputy Sheriffs William Anderson and Daniel Perkins went to the apartment and found Alvarado standing in the driveway, near the front door. Alvarado smelled of alcohol, but did not appear to be under the influence, and seemed unconcerned that the officers were there to check on a dog. Alvarado took the officers inside and into the bathroom, where Gizmo was "cowering" in the bathtub, vomiting, bleeding, wet and obviously in pain. Gizmo would not come to Alvarado when he called, so the officers were skeptical about Alvarado's statements that Gizmo was his dog.

Deputy Anderson called Duarte to ask her if Gizmo was friendly and Duarte told him about Pyro, whom Alvarado had not previously mentioned to the officers. Alvarado indicated he did not know where Pyro was; however, he later changed his story twice, first saying that the dog was having a "timeout" in the bathroom and later that the dog must have run away. Alvarado took the officers to certain sheds on the property, but not the one where Officer Perkins subsequently found Pyro's body. Alvarado did not show any reaction when the officers took him to see the dead dog. Although Alvarado continued to deny that he had injured Pyro or Gizmo, the officers arrested him. They searched for a knife or a blunt object that Alvarado might have used against the dogs, but did not find anything, although several weeks later Ballew found a butcher knife that had animal hair and canine blood on it in a bathroom cabinet.

Gizmo died several days after the attack and the deputies had veterinarians perform necropsies on the dogs' bodies. The necropsies showed that the dogs

had both suffered multiple stab wounds, which were fatal in Pyro's case, and that Gizmo had also suffered blunt force trauma that caused a massive tissue breakdown and, in turn, a fatal multi-organ failure.

In late January 2003 the district attorney filed an information charging Alvarado with two counts of animal cruelty. Trial commenced in May 2003, but the court declared a mistrial after the jury was unable to reach a verdict. At the second trial, the jury convicted Alvarado of both counts and the court sentenced him to two years in prison.

## DISCUSSION

### A. *Background*

At trial, the court instructed the jury that:

"Defendant is accused in Counts 1 and 2 of having violated Section 597[, subdivision] (a) of the Penal Code, a crime. Every person who maliciously and intentionally maims, mutilates, tortures, or wounds a living animal or maliciously and intentionally kills an animal is guilty of a violation of section 597[, subdivision] (a).

"In order to prove this crime, each of the following elements must be proved:

"One, a person maimed, mutilated, tortured, wounded, or killed a living animal; and, two, the person who committed the maiming, mutilation, torture, wounding or killing did so intentionally and maliciously."

The court also instructed the jury with modified versions of CALJIC Nos. 3.30, 3.31.5 and 1.22, respectively:

"In the crimes charged in Counts 1 and 2 . . . there must exist a union or joint operation of act or conduct and general criminal intent.

"General intent does not require an intent to violate the law. When a person intentionally does that which the law declares to be a crime, he is acting with general criminal intent even though he may not know that his act or conduct is unlawful." (See CALJIC No. 3.30.)

"In the crimes charged in Counts 1 and 2 . . . there must exist a union or joint operation of act or conduct and a certain mental state in the mind of the perpetrator. Unless this mental state exists, the crime to which it relates is not

committed. The mental state required is included in the definition of the crime set forth elsewhere in these instructions.

"In the crime of animal cruelty, the necessary mental state is maliciously [*sic*]." (See CALJIC No. 3.31.5.)

"The words malice and maliciously mean a wish—to vex, annoy, or injure or an intent to do a wrong act." (See CALJIC No. 1.22.)

Alvarado contends that the court erred in so instructing the jury because the instructions did not require the jury to find that he acted with the specific intent to maim, mutilate, torture, wound or kill a living animal.

### B. *Waiver*

■ The Attorney General preliminarily responds that Alvarado has waived any challenge to the giving of modified instructions on section 597, subdivision (a) and CALJIC No. 3.31.5 because he failed to object to the giving of those instructions below. He essentially concedes, however, that Alvarado has not waived a challenge to the giving of CALJIC No. 3.30, a concession with which we agree. The law imposes on a trial court the sua sponte duty to properly instruct the jury on the relevant law and, as such, requires the giving of a correct instruction regarding the intent necessary to commit the offense and the union between that intent and the defendant's act or conduct. (See *People v. Cummings* (1993) 4 Cal.4th 1233, 1311–1312 [18 Cal.Rptr.2d 796, 850 P.2d 1]; see generally *People v. Garcia* (2001) 25 Cal.4th 744, 754 [107 Cal.Rptr.2d 355, 23 P.3d 590] [describing the required union as so basic " 'that it is an invariable element of every crime unless excluded expressly or by necessary implication' "].) ■ Given the interwoven nature of the challenged instructions at issue relating to the requisite mental state, we cannot conclude that Alvarado waived his right to challenge any of the instructions, particularly given that " 'the correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.' " (*People v. Castillo* (1997) 16 Cal.4th 1009, 1016 [68 Cal.Rptr.2d 648, 945 P.2d 1197].)

### C. *Analysis*

Section 597, subdivision (a) provides in part: "[E]very person who *maliciously and intentionally maims, mutilates, tortures, or wounds a living animal, or maliciously and intentionally kills an animal*, is guilty of an offense punishable by imprisonment in the state prison, or by a fine of not more than twenty thousand dollars ($20,000), or by both the fine and

imprisonment, or, alternatively, by imprisonment in a county jail for not more than one year, or by a fine of not more than twenty thousand dollars ($20,000), or by both the fine and imprisonment." (Italics added.)

Prior to its amendment in 1986, section 597, subdivision (a) did not contain the element that an offender must "intentionally" maim, mutilate, torture, wound or kill a living animal. Rather, it only required that the offender commit the act "maliciously." (Stats. 1986, ch. 846, § 1, p. 2894.) Alvarado asserts that the addition of the word "intentionally" in 1986 changed section 597, subdivision (a) to a specific intent statute. This contention is unavailing.

██ "Specific and general intent have been notoriously difficult terms to define and apply . . . ." (*People v. Hood* (1969) 1 Cal.3d 444, 456 [82 Cal.Rptr. 618, 462 P.2d 370].) However, some principles are settled: "When the definition of a crime consists of only the description of a particular act, without reference to intent to do a further act or achieve a future consequence, we ask whether the defendant intended to do the proscribed act. This intention is deemed to be a general criminal intent. When the definition refers to defendant's intent to do some further act or achieve some additional consequence, the crime is deemed to be one of specific intent." (*Id.* at pp. 456–457.)

██ In other words, if the end in view is simply a proscribed act, the intent required is only a general one because no further acts or future consequences are envisioned from the illegal act. (*People v. Lyons* (1991) 235 Cal.App.3d 1456, 1460 [1 Cal.Rptr.2d 763]; *People v. Lopez* (1986) 188 Cal.App.3d 592, 598 [233 Cal.Rptr. 207].) Conversely, when the end in view looks to a further consequence of the act, the intent is specific. (*People v. Lyons, supra,* 235 Cal.App.3d at p. 1460; see also *People v. Dollar* (1991) 228 Cal.App.3d 1335, 1341 [279 Cal.Rptr. 502].) Specific intent crimes typically contain such phrases as " 'with the intent to' " achieve or " 'for the purpose of' " achieving some additional result. (*People v. Atkins* (2001) 25 Cal.4th 76, 86 [104 Cal.Rptr.2d 738, 18 P.3d 660] (*Atkins*).)

██ "Our analysis must . . . begin with an examination of the statutory language describing the proscribed conduct, including any express or implied reference to a mental state." (*People v. Hering* (1999) 20 Cal.4th 440, 445 [84 Cal.Rptr.2d 839, 976 P.2d 210].)

Here, section 597, subdivision (a) does not state that an offender under that section must have an intent to do some further act or achieve some further consequence other than the proscribed acts. It does not contain a phrase such as "with the intent to" or "for the purpose of" that would be used in a specific

intent crime. If the Legislature intended section 597, subdivision (a) to describe a specific intent crime, it would have used language describing an act and an additional purpose for which the act was done. For instance, the statute could have read, "Every person who maliciously and intentionally strikes a living animal, with the intent to maim, mutilate, etc." Or the statute could have read, "Every person who maliciously and intentionally maims, mutilates, tortures or wounds a living animal, for the purpose of inflicting pain and suffering . . . ." Drafted in either manner, the statute would have described a specific intent crime.

Nor does the combination of the words "maliciously and intentionally" turn section 597, subdivision (a) into a specific intent statute. *Atkins, supra,* 25 Cal.4th 76, is instructive.

In *Atkins,* the California Supreme Court was presented with the issue of whether the crime of arson was a general or specific intent crime. The statute at issue there, section 451, provides that: "A person is guilty of arson when he or she *willfully and maliciously* sets fire to or burns or causes to be burned or who aids, counsels, or procures the burning of, any structure, forest land, or property." (Italics added.) In concluding that section 451 was a general intent statute, the high court rejected the idea that the term "willfully and maliciously" was used to describe a specific intent crime: " '[T]he terms "willful" or "willfully," when applied in a penal statute, require only that the illegal act or omission occur "intentionally," without regard to motive or ignorance of the act's prohibited character.' [Citation.] 'Willfully implies no evil intent; " 'it implies that the person knows what he is doing, intends to do what he is doing and is a free agent.' [Citation.]" ' [Citations.] The use of the word 'willfully' in a penal statute usually defines a general criminal intent, absent other statutory language that requires 'an intent to do a further act or achieve a future consequence.' [Citations.]" (*Atkins, supra,* 25 Cal.4th at p. 85.)

The court came to a similar conclusion with regard to use of the term "maliciously": "As with 'willfully,' the statutory definition of 'maliciously,' in the context of arson, requires no specific intent. Section 450, subdivision (e) defines 'maliciously' in terms of the arson statutes as 'a wish to vex, defraud, annoy, or injure another person, or an intent to do a wrongful act . . . .' This is the same definition found in section 7, subdivision 4, except for the addition of 'defraud.' Outside the context of arson, the term 'malicious,' as used in section 7, subdivision 4, does not transform an offense into a specific intent crime. [Citations.] Nor does the term 'malicious' transform an offense into a specific intent crime in the context of arson. [Citations.]" (*Atkins, supra,* 25 Cal.4th at pp. 85–86.)

 The expressions "willfully," "knowingly," "intentionally," and "maliciously" are expressions of general, not specific, intent when used in a penal statute. (*People v. Williams* (1980) 102 Cal.App.3d 1018, 1029 [162 Cal.Rptr. 748]; *People v. Ramsey* (2000) 79 Cal.App.4th 621, 632 [94 Cal.Rptr.2d 301].) More specifically, the term "intentionally" in a penal statute refers to general intent: "[T]he occurrence of the terms 'intentionally' and 'knowingly' in a penal statute do not imply that the offense so defined is a specific intent crime. As a rule, the term 'intentionally' requires only that the agent acted intentionally in engaging in the proscribed conduct, and not that the agent knew that the conduct was proscribed." (*People v. Ramsey, supra,* at p. 632.)

The concurring opinion argues that section 597, subdivision (a) is a specific intent statute because the listed wrongful conduct (maims, mutilates, tortures, or wounds) did not describe initial acts, but rather the ultimate result. This contention is also unavailing.

The California Supreme Court's decision in *People v. Sargent* (1999) 19 Cal.4th 1206 [81 Cal.Rptr.2d 835, 970 P.2d 409] (*Sargent*) is instructive. In *Sargent*, the California Supreme Court addressed the intent required for child abuse by direct assault. Section 273a, subdivision (a) provides: "Any person who, under circumstances or conditions likely to produce great bodily harm or death, willfully causes or permits any child to suffer, or inflicts thereon *unjustifiable physical pain or mental suffering*, or having the care or custody of any child, willfully causes or permits the person or health of that child to be injured, or willfully causes or permits that child to be placed in a situation where his or her person or health is endangered, shall be punished by imprisonment in a county jail not exceeding one year, or in the state prison for two, four, or six years." (Italics added.)

 The high court held that the direct infliction of "unjustifiable physical pain or mental suffering" describes a general intent crime. (*Sargent, supra,* 19 Cal.4th at pp. 1219–1220.) As the court stated there, the "actus reus for [child abuse by direct assault] is infliction of unjustifiable physical pain or mental suffering on a child." (*Id.* at p. 1222.) The mens rea for the crime is the intent to perform the underlying injurious act on a child. (*Id.* at pp. 1220, 1223.)

The phrase infliction of "unjustifiable physical pain or mental suffering" could be described as much an end result as the terms "maim, mutilate, torture, or wound." However, in both cases, these acts were used in the statutes to describe the proscribed *acts*. Thus, the high court in *Sargent* made clear that regardless of whether the proscribed act could also in some circumstances be considered an end result, where it is used to describe the act itself and there is no further purpose or result required, it is a general intent crime.

Our review of cases from other jurisdictions also supports our conclusion that section 597, subdivision (a) is a general intent statute.[2] Two state opinions and one from the District of Columbia specifically addressing the question of whether their animal cruelty statutes require general or specific intent concluded that their animal cruelty statutes required only general intent. (*People v. Fennell* (2004) 260 Mich.App. 261 [677 N.W.2d 66, 71] (*Fennell*); *Reynolds v. State* (Fla. 2002) 842 So.2d 46, 48 (*Reynolds*); *Regalado v. United States* (D.C.App. 1990) 572 A.2d 416, 420 (*Regalado*).) In *Fennell*, the Michigan Court of Appeals addressed the required intent for that state's animal cruelty statute that provided: "A person who *willfully, maliciously and without just cause or excuse kills, tortures, mutilates, maims, or disfigures an animal* . . . is guilty of a felony . . . ." (*Fennell, supra,* 677 N.W.2d at p. 70, some italics added.) The defendant in that case asserted that the Michigan Legislature's use of the word "willfully" demonstrated that the statute described a specific intent crime. (*Id.* at pp. 69–70.) In the majority opinion, the court of appeals rejected this contention, concluding that because the term "willful" simply meant "purposeful action in the context of a crime," the statute described a general intent crime. (*Id.* at p. 71.)

In *Reynolds*, the animal cruelty statute stated: " 'A person who *intentionally commits an act* to any animal which results in the *cruel death*, or *excessive or repeated infliction of unnecessary pain or suffering*, or causes the same to be done, is guilty of a felony of the third degree . . . .' " (*Reynolds, supra,* 842 So.2d at p. 49, second and third italics added.) The Florida Supreme Court concluded that the plain language of the statute provided that it described a general intent crime: "The language of the statute expressly requires only that the defendant 'intentionally commit an act,' with the word 'intentionally' modifying the phrase 'commit an act.' Hence the Legislature has expressed no intent to create an additional element requiring proof that an alleged offender acted with the mental intent to inflict a cruel death or unnecessary suffering." (*Ibid.*)

In *Regalado*, the relevant animal cruelty statute did not specify what intent was required to prove a violation. (*Regalado, supra,* 572 A.2d at p. 419.) Nevertheless, the District of Columbia Court of Appeals concluded that it was a general intent crime because "the general intent with malice requirement reflects the growing concern in the law for the protection of animals, while at

---

[2] Although no reported decision in California has decided the precise issue presented here, in *People v. Farley* (1973) 33 Cal.App.3d Supp. 1 [109 Cal.Rptr. 59], an appellate division of the superior court in dicta stated that section 597 described a general intent crime. However, a close review of that decision reveals that the appellate division was interpreting that portion of section 597 that is now codified in subdivision (*b*), which makes it a misdemeanor to fail to provide an animal with food or water. (*People v. Farley, supra,* at pp. Supp. 8–10.) Thus, this case is not helpful to our determination whether section 597, subdivision (a) is a general or specific intent statute.

the same time acknowledging that humans have a great deal of discretion with respect to the treatment of their animals." (*Id.* at p. 420.)

■ Based upon the legal principles described above, and the language of section 597, subdivision (a), we conclude that it is a general intent statute, and the court therefore did not err in refusing the instruct the jury that Alvarado must have acted with the specific intent to maim, mutilate, torture, wound or kill a living animal.[3]

### DISPOSITION

The judgment is affirmed.

Haller, J. concurred.

**McINTYRE, J.,** Concurring.—Although I agree with the result reached by the majority, I write separately because I disagree with the majority's conclusion that a Penal Code section 597, subdivision (a) offense is a general intent crime. (All statutory references are to the Penal Code.) Section 597, subdivision (a) originally made it a crime to "maliciously" maim, mutilate, torture, wound or kill a living animal. In applying this statute, the courts deemed "malice" to refer to the intent to do a wrongful act. (*People v. Dunn* (1974) 39 Cal.App.3d 418, 420–421 [114 Cal.Rptr. 164]; see *Ex parte Mauch* (1901) 134 Cal. 500, 501 [66 P. 734] [criminal complaint charging the defendant with willful and unlawful cruelty was sufficient to allege malice].) In 1986, the Legislature amended section 597, subdivision (a) to specify that the offender must "maliciously *and intentionally*" maim, mutilate, torture, wound or kill a living animal. (Stats. 1986, ch. 846, § 1, p. 2894.)

Generally, the concept of "intentional" or "willful" conduct does not imply an evil intent but rather means the person " 'knows what he is doing, intends to do what he is doing and is a free agent.' " (*People v. Atkins* (2001) 25 Cal.4th 76, 85 [104 Cal.Rptr.2d 738, 18 P.3d 660].) Thus, a crime requiring intentional or willful conduct is usually construed to be a general intent crime, unless the statutory language specifies that the defendant must intend not only to commit the act proscribed by the statute, but also to commit some further act or achieve some future consequence. (*Ibid.*; *People v. Hagen*

---

[3] Because we conclude that section 597, subdivision (a) describes a general intent crime, we need not address Alvarado's contention that because section 597, subdivision (a) describes a specific intent crime, the court erred in failing to instruct the jury with the word "intentionally" as one of the mental states for the jury to consider in the voluntary intoxication instruction. Such an instruction would only be appropriate if section 597, subdivision (a) were a specific intent statute. (§ 22; *People v. Mendoza* (1998) 18 Cal.4th 1114, 1125 [77 Cal.Rptr.2d 428, 959 P.2d 735].)

(1998) 19 Cal.4th 652, 663 [80 Cal.Rptr.2d 24, 967 P.2d 563].) "In the final analysis, however, the meaning of the word 'willfully' [or 'intentionally'] in any given statute is dependent on the context in which it is used." (*People v. Lewis* (2004) 120 Cal.App.4th 837, 852 [15 Cal.Rptr.3d 891], citing *People v. Garcia* (2001) 25 Cal.4th 744, 753 [107 Cal.Rptr.2d 355, 23 P.3d 590].)

Where a statute requires a willful act followed by some particular result, the intent element is generally construed as referring only to the initial act and not to the ultimate result and, as such, the crime is deemed to be one requiring general intent. (*People v. Hering* (1999) 20 Cal.4th 440, 446–447 [84 Cal.Rptr.2d 839, 976 P.2d 210]; *People v. Lewis, supra*, 120 Cal.App.4th at p. 853.) General intent offenses include: assault (*People v. Williams* (2001) 26 Cal.4th 779, 784, 787–788, 790 [111 Cal.Rptr.2d 114, 29 P.3d 197] [intent to commit an act with knowledge of facts sufficient to establish that the act by its nature would probably and directly result in the application of physical force to another]); battery (*People v. Lara* (1996) 44 Cal.App.4th 102, 107 [51 Cal.Rptr.2d 402] [intent to commit an unlawful use of force or violence on another]); simple mayhem (*People v. Reed* (1984) 157 Cal.App.3d 489, 492 [203 Cal.Rptr. 659] [intent to engage in conduct that foreseeably results in the victim's disfigurement]); rape (*People v. Linwood* (2003) 105 Cal.App.4th 59, 70 [129 Cal.Rptr.2d 73] [intent to commit sexual intercourse]); sodomy (*People v. Pearson* (1986) 42 Cal.3d 351, 355–356 [228 Cal.Rptr. 509, 721 P.2d 595] [intent to commit act of sodomy]); and arson (*People v. Atkins, supra*, 25 Cal.4th at p. 89 [intent to set a fire under circumstances that the direct, natural and highly probable consequences would be the burning of a structure or property].) As to such offenses, the willfulness or intent element merely requires that the defendant intend the initial act, but not the particular result. (See *People v. Atkins, supra*, 25 Cal.4th at pp. 85–89.)

When, on the other hand, the statutory definition refers to the defendant's intent to do some further act or to achieve some additional consequence, the crime is deemed to be a specific intent crime. (*People v. Hering, supra*, 20 Cal.4th at p. 445.) The following offenses are deemed to require specific intent: attempt crimes (§§ 21a, 664 [intent to commit the underlying offense]); receiving stolen property (*People v. Reyes* (1997) 52 Cal.App.4th 975, 982–986 [61 Cal.Rptr.2d 39] [intent to aid the thief or to deprive the owner of possession of the property]); and aggravated mayhem (*People v. Ferrell* (1990) 218 Cal.App.3d 828, 832–833 [267 Cal.Rptr. 283] [intent to cause permanent disability or disfigurement]).

The issue here is whether section 597, subdivision (a) falls into the former or latter category. Section 597, subdivision (a) does not describe an intent to do an initial act that causes injury or death to an animal, but instead refers to

the result itself, i.e., the maiming, mutilation, torture, wounding or killing. As written, the statutory language establishes that the defendant must intend the end result (that is, to maim, mutilate, torture, wound or kill the animal), rather than merely harbor the intent to do the wrongful act that causes such a result (in this case, wielding the knife). (See *People v. Ferrell, supra*, 218 Cal.App.3d at p. 833 [holding that aggravated mayhem (which includes the element of "intentionally and unlawfully causing another person to sustain permanent disability or disfigurement" or loss of limb, organ or other member) is a specific intent crime].) As such, the crime is a specific intent crime.

Notwithstanding the statutory language, my colleagues conclude that section 597, subdivision (a) requires only a general intent; pursuant to their interpretation of the statute, Alvarado must merely have intended *to commit an act that results in* the maiming, mutilating, torturing, wounding or killing of the animal rather than an intent to achieve such a result. According to this analysis, a jury could convict Alvarado of violating section 597, subdivision (a) based on a finding that he intentionally wielded the knife rather than a finding that he intended to injure the dogs. This analysis, however, essentially involves a rewriting of the statutory language, something that this court is not free to do. (See *People v. Angel* (1999) 70 Cal.App.4th 1141, 1150 [83 Cal.Rptr.2d 222]; *Gray Cary Ware & Freidenrich v. Vigilant Insurance Co.* (2004) 114 Cal.App.4th 1185, 1190 [8 Cal.Rptr.3d 475] ["our role to ascertain the meaning of the words used, not to insert what has been omitted or otherwise rewrite the law to conform to an intention that has not been expressed"].) In effect, the majority's interpretation of section 597, subdivision (a) rewrites the crime to be one where the person maliciously and intentionally *commits an act* that maims, mutilates, tortures, wounds or kills the animal. In light of the statutory language specifying that the defendant must "maliciously and intentionally" maim, mutilate, torture, wound or kill an animal, I simply cannot agree with the majority's conclusion that a more generalized intent is required. (See *People v. Lewis, supra*, 120 Cal.App.4th at pp. 852–853.)

Having disagreed with my colleagues on the legal question, I nonetheless concur in the result because I conclude that the court's instructions to the jury regarding the necessary intent were sufficient. The court instructed the jury:

"Defendant is accused in Counts 1 and 2 of having violated Section 597(a) of the Penal Code, a crime. *Every person who maliciously and intentionally maims, mutilates, tortures, or wounds a living animal or maliciously and intentionally kills an animal is guilty of a violation of section 597(a).*

"In order to prove this crime, each of the following elements must be proved: [¶] One, a person maimed, mutilated, tortured, wounded, or killed a

living animal; and, two, the person who committed the maiming, mutilation, torture, wounding or killing did so intentionally and maliciously." (Italics added.) This is exactly what the statutory language requires, although under the majority's view, these instructions were incorrect. No reasonable juror would interpret these instructions to require anything less than the intent to maim, mutilate, torture, wound or kill.

Alvarado contends, however, that the court's giving of CALJIC No. 3.30 (relating to the requirement of "a union or joint operation of act or conduct and general criminal intent") and its failure to specifically instruct the jury regarding the effect of intoxication on the formation of the required specific intent (in addition to malice) requires reversal of his convictions. I cannot agree with Alvarado's contention. While I believe that CALJIC No. 3.30 fails to convey any meaningful thought to the average juror, it merely specifies that a person acts with general criminal intent when he "intentionally does that which the law declares to be a crime." This language could not possibly have misled the jury about the required mental state, as to which the court correctly instructed the jury. (*People v. Fabris* (1995) 31 Cal.App.4th 685, 699–700 [37 Cal.Rptr.2d 667], disapproved on other grounds by *People v. Atkins, supra,* 25 Cal.4th at p. 90, fn. 5.)

Further, the court's failure to give a specific instruction relating intoxication to the required statutory intent would not support a reversal in this case. The classification of offenses as specific or general intent crimes is also relevant in determining whether the requisite intent can be negated by the defendant's voluntary intoxication or mental disease, defect or disorder. (§§ 22, 28; *People v. Mendoza* (1998) 18 Cal.4th 1114, 1128 [77 Cal.Rptr.2d 428, 959 P.2d 735]; *People v. Fabris, supra,* 31 Cal.App.4th at p. 696, fn. 10 [recognizing that under existing case law, "the criteria of specific intent for [the purpose of section 22] are not necessarily the same as the criteria of specific intent as a measure of the scienter required for an offense"].) However, as the California Supreme Court has recognized, the definition of a crime as a specific or general intent crime cannot be applied mechanically in determining whether evidence of the defendant's intoxication is relevant as to a particular offense; rather " 'the decision whether or not to give effect to evidence of intoxication [in a prosecution for [a particular offense]] must rest on other considerations.' " (*People v. Whitfield* (1994) 7 Cal.4th 437, 449 [27 Cal.Rptr.2d 858, 868 P.2d 272] [holding evidence of voluntary intoxication was admissible as against a charge of murder in the second degree based on implied malice, even though that crime was not a specific intent crime].)

Notwithstanding the high court's directive, the published appellate cases continue to analyze the issue of the relevance of intoxication, as the majority does here, based on mechanical application of the statutory language, without

any discussion of the underlying policy considerations. In addition, the courts have long recognized that the distinction between specific intent or general intent offenses has proven to be elusive, with the terms being " '. . . notoriously difficult . . . to define and apply' " and indeed "mischievous" in many instances. (*People v. Hering, supra,* 20 Cal.4th at p. 445, quoting *People v. Hood* (1969) 1 Cal.3d 444, 456 [82 Cal.Rptr. 618, 462 P.2d 370].) In light of the continuing uncertainty surrounding the determination of whether a particular offense requires specific or general intent and the standards for making such a determination, I would urge the California Supreme Court to provide further guidance on these issues.

In this case, the court admitted evidence of Alvarado's intoxication and instructed the jury that, if Alvarado was intoxicated at the time of the charged offenses, that fact should be considered in determining whether Alvarado had the required mental state of malice. Assuming, without deciding, that the policy considerations support a conclusion that evidence of Alvarado's intoxication is relevant to whether he harbored the intent to maim, mutilate, torture, wound or kill the dogs, I would in any event conclude that the court's failure to specifically so instruct the jury was harmless. (See *People v. Haley* (2004) 34 Cal.4th 283, 314 [17 Cal.Rptr.3d 877, 96 P.3d 170], citing *People v. Flood* (1998) 18 Cal.4th 470, 504 [76 Cal.Rptr.2d 180, 957 P.2d 869] [a "trial court's instructional error is amenable to harmless error analysis [when] it appears beyond a reasonable doubt that the error did not contribute to the jury's verdict"].) The instructions were sufficient to inform the jury as to the required intent and the court did instruct the jury that the evidence of Alvarado's intoxication was relevant to his mental state. Further, in light of the evidence of the multiplicity and extent of the injuries to the dogs, I am convinced beyond a reasonable doubt that, even absent the error, the jury would have concluded Alvarado intended to maim, mutilate, torture, wound or kill the dogs and thus that the error did not contribute to the jury's verdict.

A petition for a rehearing was denied January 27, 2005, and appellant's petition for review by the Supreme Court was denied April 27, 2005.